No. 22-30389

---

# In the United States Court of Appeals for the Fifth Circuit

---

VIRGINIA M. ADAMS,
*Plaintiff-Appellant*,

*v.*

Columbia/HCA of New Orleans, Incorporated, incorrectly identified by Plaintiff as Lakeview Regional Medical Center, LLC, doing business as Lakeview Regional Medical Center
*Defendant-Appellee.*

---

**On Appeal from**
United States District Court for the Eastern District of Louisiana
2:20-CV-3030

---

**BRIEF OF APPELLANT VIRGINIA M. ADAMS**

---

VICTOR R. FARRUGIA
State Bar No. 19324
vfarrugia@farrugialawfirm.com
FARRUGIA LAW FIRM, LLC
1340 Poydras St., Suite 2100
New Orleans, LA 70112
(504) 525-0250 (office)
(504) 293-0651 (facsimile)
Counsel for Plaintiff-Appellant
Virginia Adams

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5ᵗʰ CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellee: | Counsel for Appellees: |
|---|---|
| Columbia/HCA of New Orleans, Incorporated | Leslie Ehret of Frilot, L.L.C. New Orleans, LA |
| Columbia/HCA of New Orleans, Incorporated | Anna Potter of Frilot, L.L.C. New Orleans, LA |

| Appellant: | Counsel for Appellants: |
|---|---|
| Virginia Adams | Victor Farrugia of Farrugia Law Firm, LLC. New Orleans, LA |

/s/Victor R. Farrugia
Attorney of record for Appellant Virginia Adams

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Virginia Adams requests oral argument as she believes it could significantly aid the decisional process in this case. Oral argument will assist the Court in understanding the legal error which was committed by the district court in dismissing Adams' FMLA interference claim. This claim includes Lakeview denying Adams' right to use FMLA for being tardy, to have her intermittent FMLA leave calculated in time intervals consistent with Lakeview's accounting, to receive a written notification that her FMLA leave would be charged against her PTO, and to not fire her for using and attempting to use her FMLA leave. Oral argument will also assist the Court in understanding the legal error which was committed by the district court in dismissing Adams' claims of violation of the Americans with Disabilities Act. These claims are that Lakeview discriminated against Adams because of her disability, failed to make reasonable accommodation for Adams' disability, and failed to enter into the interactive process to arrive at a reasonable accommodation. Adams will show how these legal errors relate to the disputed issues of material fact as disclosed by the substantial record. Oral argument is the most efficient manner to provide this assistance to the Court by responding to any questions it may have about the fact intensive record and the appropriate legal analysis applicable to this case.

# TABLE OF CONTENTS

Contents                                                              Page(s)

CERTIFICATE OF INTERESTED PERSONS ...................................................... 2

STATEMENT REGARDING ORAL ARGUMENT ............................................. 3

TABLE OF CONTENTS ...........................................................................................4

TABLE OF AUTHORITIES........................................................................................ 6

JURISDICTIONAL STATEMENT ........................................................................... 9

STATEMENT OF THE ISSUES ......................................................................... 10

STATEMENT OF THE CASE ................................................................................12

**I. Facts**……………………………………………………………..……………......12

  A.  Prior to approval of FMLA leave on October 11, 2018…………..……..……12

  B.  After approval of FMLA leave until incident of July 25, 2019...…………...15

  C.  Incident of July 25, 2019, until EEOC Notice of Right to Sue……..………20

**II.  Procedural History**……………………………………………..…...………......24

SUMMARY OF THE ARGUMENT ...................................................................... 25

ARGUMENT………………………………………………………………......27

I.   Standard of Review………………………………………………………………27

II.  Summary Judgment Standard and 12(b)(6) Motion to Dismiss Standard ….....27

III.   After Adams' intermittent FMLA leave was approved, Lakeview disciplined Adams for incidents when her illness caused her to be tardy when arriving at work. Lakeview violated the FMLA and its own company policy when it denied or discouraged Adams' use of her FMLA leave for these occasions of being tardy. ...…….……………………………………...…29

IV.   Lakeview interfered with Adams' right to have her intermittent FMLA leave calculated in 15-minute intervals and her right to receive written notice that her FMLA leave would be charged against her PTO ..……………………………………………………………...…32

V.   Lakeview violated the FMLA when it fired her for using or attempting to use her FMLA leave……………………………….…………..35

VI.   Lakeview violated the ADA when it discriminated against Adams because of her disability when it disciplined her and when it fired her...……………....38

VII.   The district court erred in granting motion to dismiss in the failure to make reasonable accommodation claim………………………………………..51

VIII.  The district court erred in granting motion to dismiss in the failure to enter into interactive process…………..………………. ……………………...53

IX.   The district court erred when it denied Adams' motion to file surreply to Defendant's motion for summary judgment…………………….………53

CONCLUSION………………………………………………………...…56

CERTIFICATE OF SERVICE……………………………………………....57

CERTIFICATE OF COMPLIANCE…………………………………………...57

## TABLE OF AUTHORITIES

Cases

*Acker v. General Motors*, *L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017)…………….29

*Barrasso v. Children's Hosp. of Pittsburgh* , Civil Action No. 17-0267, at *22-23 (W.D. Pa. Jan. 28, 2019)……………………………………………………….33

*Bryant v. Tex. Dep't of Aging & Disability Servs.*, 781 F.3d 764, 770 (5th Cir. 2015) ………………………………………………………………….……...29

*Bradford v. Law Firm of Gauthier, Houghtaling & Williams, L. L.P.*, No. 17-30037, at *5 (5th Cir. June 22, 2017)…………………………………………....27,29.

*Butler v. Porter*, 999 F.3d 287, 298 n.6 (5th Cir. 2021)…………………………..54

*DePree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009). *Mozingo v. Oil States Energy, Inc.*, 661 F. App'x 828, 3 (5th Cir. 2016)………..……………………….27

*DeVoss v. Southwest Airlines Company*, 903 F.3d 487, 490 (5th Cir. 2018………30

*Equal Emp't Opportunity Comm'n v. Vantage Energy Servs.*, 954 F.3d 749, 753 (5th Cir. 2020)……………………………………………...…………………..27

*Equal Employment Opportunity Commission v. LHC Group, Inc.*, 773 F.3d 688, 702-03 (5th Cir. 2014)……………………………………………….……39,52

*Erickson v. Penn Nat'l Gaming, Inc.*, CIVIL ACTION No. 19-00451-BAJ-EWD, at *4-5 (M.D. La. Mar. 25, 2021)…………………………………………………….30

*Foley v. Town of Marlborough*, 3:19-cv-01481 (VAB), at *55 (D. Conn. Aug. 29, 2022)……………………………………………………………………....34

*Herster v. Bd. of Supervisors of La. State Univ.*, 221 F.Supp.3d 791

(M.D. La. 2016)…………………………………………………..…………..36

*Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020)…….28

*Kitchen v. BASF*, 952 F.3d 247 (5th Cir. 2020…………………………………….43

*Machinchick v. PB Power, Inc.,* 398 F.3d 345, 355 (5th Cir.2005)……………….39

*Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016)…………………….28

*Park v. Direct Energy GP*, *L.L.C.*, 832 Fed. Appx. 288, 290 (5th Cir. 2020)…….29

*Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437 (5th Cir. 2017)…………………..52

*Pinkerton v. Spellings,* 529 F.3d 513, 519 (5th Cir.2008)…………………………39

*RedHawk Holdings Corp. v. Schreiber Tr. ex rel. Schreiber Living Tr.*, 836 F. App'x

232, 235 (5th Cir. 2020) (per curiam)………………….…………………..27,54

*Rodriguez v. Eli Lilly & Co.* , 820 F.3d 759, 765 (5th Cir. 2016)…………………43

*Ruiz v. Brennan* , 851 F.3d 464, 468 (5th Cir. 2017)………………………………27

*Reed v. Neopost USA, Inc.,* 701 F.3d 434, 438 (5th Cir.2012)…………………….28

*Sandstad v. CB Richard Ellis, Inc.* , 309 F.3d 893, 897 (5th Cir. 2002)…………...42

*Sherman v. Christus St. Michael Health Sys.*, No. 5:11CV92, at *1 (E.D. Tex. Aug.

17, 2012)………………………………………………………………….…30

*Stallings v. Hussman Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)……………..29

*Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007)..………….…………....….27,29

Statutes

Americans with Disabilities Act ("ADA")…………………………………..…9,31

Family and Medical Leave Act ("FMLA")…………………………………….9,31

28 U.S.C. §1331………………………………………………………………..9

28 U.S.C. § 1291……………………………………….…………………….9

In 42 U.S.C. § 12112- (b)(5)(A)……………………………………………….52

Rule 12(b)(6)……………………………………………….........27,29

*Title 29, Subtitle B,Chapter V, Part 825 - The Family and Medical Leave Act of 1993,  825.220 (c)……………………………………………..…….…30*

29 C.F.R. § 825.205(a)(1) (ECF No. 60, pg. 9)…………………………….....33

29 CFR § 825.220………………………………………………….....37

29 C.F.R. § 825.300…………………….…………………………….....34

https://www.benadryl.com/products/benadryl-extra-strength-allergy-ultratabs.....40

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction over the federal claims arising under the ADA and FMLA pursuant to 28 U.S.C. §1331. The judgment appealed from was entered by the United States District Court for the Eastern District of Louisiana on June 3, 2022. ROA.2955.  Adams timely appealed by filing her notice of appeal on June 25, 2022. ROA.2956. This appeal is from a final order and a judgment that disposed of all of Adams' claims. It is also an appeal of other adverse orders and rulings of the district court. This Court has jurisdiction for this appeal from the final judgment and all adverse orders and rulings under 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

This appeal raises questions regarding the sufficiency of evidence required to survive summary judgment for Adams' FMLA and ADA claims, the sufficiency of the complaint to survive a motion to dismiss for two of Adams' ADA claims, and whether the plaintiff should have been allowed to file her surreply to the motion for summary judgment.

1. **Adams' evidence is sufficient to survive summary judgment in her claim that Lakeview has interfered with, restrained, or denied her exercise or attempt to exercise her FMLA rights.**

A. Did Lakeview deny Adams, or discourage her from using, her entitlement to use her intermittent FMLA leave for late arrivals at work in the mornings caused by her serious illness?

B. Did Lakeview deny Adams, or discourage her from using, her entitlement to use her intermittent FMLA leave in the smaller 15-minute increments?

C. Did Lakeview fail to give Adams written notice that it was requiring her to use her accrued paid PTO for her FMLA leave?

D. Did the above violations prejudice Adams?

E. Did Lakeview violate the FMLA when it fired her?

**2.** **Adams has produced sufficient evidence from which a jury could conclude that the real reason for her termination was discrimination on account of her disability, not her violation of Lakeview's Substance Use Policy.**

A. Lakeview's proffered explanation for discharge, that Adams violated the Substance Use Policy is false and unworthy of credence.

B. Adams has produced sufficient evidence to show that Team Lead A is a comparator. Her Blood Bank errors were comparable to those of Adams.

C. Adams was subject to disparate treatment in receiving disciplinary actions for Blood Bank errors when Team Lead A did not receive disciplinary actions for comparable violations.

**3.** **The district court erred in granting motion to dismiss in the failure to make reasonable accommodation claim.**

**4.** **The district court erred in granting motion to dismiss in the failure to engage in the interactive process.**

**5.** **The district court judge abuse his discretion when he denied Adams' request to file a surreply further opposing the motion for summary judgment.**

## STATEMENT OF THE CASE

**Facts**

### A. Prior to approval of FMLA leave on October 11, 2018

Adams was employed by Lakeview from September 2007 until she was fired on August 9, 2019, except for a nine-month period in 2017. She was never written up for anything during her first 11 years working for Lakeview.  ROA.2264.

Adams is a person with a disability. She has allergies, asthma, and mast cell disease. To control the symptoms of mast cell disease, Adams takes many medications. One of these medications is over-the-counter Benadryl. Adams has been taking Benadryl since she was a child to combat symptoms of her allergies and asthma. ROA.2272.

After a brief time away from Lakeview, Adams was hired in January 2018 to be the Section Supervisor for the department of Urinalysis/Serology. Adams was hired for a position described as Laboratory Lead, but her initial job description listed her as a section supervisor. ROA.2261, ROA.2334-2352.

The job offer Adams accepted was an 11:00 am to 7:30 pm position, with rotating weekends. ROA. 2261.

Adams was an excellent employee. She was evaluated as one of the fastest learners they have ever had in the lab. She was evaluated as responsible, intelligent and able to make decisions like a seasoned tech. ROA. 2394. In a performance

evaluation by Shemroski for the period January 15, 2018 to April 15, 2018, dated May 10, 2018, that was presented to Adams on September 12, 2018, Shemroski rated Adams highly. For example, Shemroski rated Adams the highest rating: "Exceeds," in Quality/Patient Safety. She commented of Adams, "Has offered numerous improvements for trackers to improve patient care and TAT." ROA.1207. Shemroski rated Adams "A" for Teamwork, Managing Work, Adaptability, Accountability, Respect/Ethics & Compliance, and Safety. Shemroski made the following comments: "Adaptable to fluctuating workloads, demonstrates full accountability and integrity, complies with policy and demonstrates safety practices." ROA.1207-1221.

Although Adams was hired as a section supervisor, Adams agreed to work in other departments as a general medical technologist to provide coverages for lunches, days off, and occasional time off the bench for other Section Supervisors/Lead Techs. Adams spent the majority of her time in her section, approximately 75%; the remainder of her time, 25%, was divided between four departments; 5% Hematology, 5% Chemistry, 5% Blood Bank and 10% Reference Lab/IT. ROA.2262.

Rarely does a section supervisor have to spend time outside of their assigned section. In fact, the other two section supervisors for Hematology and Chemistry were not required to obtain competency to be able to work in Blood Bank. The

Urinalysis/Serology section supervisors at Lakeview prior to Adams were not required to obtain competency in Blood Bank. ROA.2261-2262.

Although Blood Bank is listed on the job descriptions of the Lead Tech, Medical Technologist, and Medical Laboratory Technician, it is not required of every employee. ROA. 2542,2553, ROA.2526,2535, ROA.2511, 2519. Likewise, the Microbiology department is listed on each of the previous job descriptions, yet microbiology is no longer performed at Lakeview. ROA.2262.

Her disability got progressively worse in 2018. Adams obtained a prescription from her physician, Dr. Olivier, for use of Benadryl to help alleviate her symptoms. ROA.2332.

On 10/4/18, Shemroske called Adams and left a message that Adams needed to go to work that day because she did not have enough PTO to cover the day off. Adams was unable to go work that day because Adams had a lengthy doctor's appointment. Adams tried to schedule doctor's appointments on her days off instead of asking off work. ROA.2264. Shemroske said on the voicemail, "to take another day off, you don't have any PTO to use and that's something you really can't do." ROA.2567.

On 10/1018, Chaz MacKay of Sedgwick sent Shemroske an email rejecting Adams' request for FMLA leave because he thought at that time that Adams had not worked for Lakeview the requisite 12 months. In this email Sedgwick informed

Shemroski that "if this leave request is for your employees own serious health condition, it may be appropriate to discuss accommodations relative to the Americans with Disability Act Amendments Act (ADAAA). If applicable, please contact your facilities human resources department to request the interactive process begin." ROA.504.

## B. After approval of FMLA leave until incident of July 25, 2019

Shemroske received notice from Sedgwick on October 9, 2018, that Adams' intermittent FMLA leave was approved. She informed Atkinson of that fact and he replied that even though FMLA was approved he still wanted Shemroske to have a conversation with Adams about timely reporting to work. ROA.2434, 2433.

When Adams started using her FMLA leave, Shemroske told her that FMLA was not to be used to excuse tardiness caused by her illness, but only to cover scheduled doctors' appointments. Adams had a problem with tardy occurances. As Dr. Olivia stated in the FMLA Certification for Adams' serious health condition, Adams suffered the symptoms of flushing, diarrhea, dizziness, hives and dyspnea, associated with her Mast Cell Activation Syndrone (MCAS). Dr. Olivia was unable to estimate the frequency of Adams' flare-ups. ROA.275, 276.

In October and November 2018, and January 2019, Adams was tardy to work 12 times. ROA.1299, 1300. Shemroske would not allow Adams during this period to use her intermittent FMLA for these tardy occurances caused by her serious health

condition. In fact Shemroske put Adams on an Employee Performance Improvement Plan ("PIP") on October 9, 2018. This PIP stated that "FMLA not to be applied to tardy occurrences." ROA.2459. The progress notes on the PIP indicate 8 tardy occurances for the month, totaling 5 attendance points. ROA.2459.

On 10/22/18 Adams made an observation in Blood Bank that highlighted a computer error where the Laboratory Information System (LIS) did not stop her from crossmatching a B Pos unit. Adams further tested the LIS error and it also did not stop her from issuing the unit in the computer. As is customary when an issue is found, Adams printed out the error and left the printout with her notes for Fast-Winston the Blood Bank supervisor. There was a brief conversation about it with Fast-Winston but it was not written up. Shemroske or Fast-Winston later wrote this incident up as a technical error on a competency assessment form. However, unlike any other competency assessment forms, there are no signatures or further action to be taken. ROA.1222-1224.

On November 2, 2018, Shemroske gave Adams a "verbal" (although written and signed) attendance Disciplinary Action. Although the company has a progressive disciplinary policy, on this first disciplinary action, Shemroske wrote that "Failure to demonstrate immediate, significant, and sustained improvement will result in additional disciplinary action up to and possibly including termination of employment." On this Disciplinary Action, Shemroske indicated that the offense

was obtaining 5 attendance points. Shemroske also wrote that she expected Adams to arrive within 7 minutes of start time of 11 AM. ROA.1339. Adams was surprised by this disciplinary action because she had been approved for FMLA leave in early October. ROA.2265.

On the same day, November 2, 2018, Adams was given a second PIP. This PIP also stated that FMLA is not to be applied to tardy occurrences. ROA.2460, 2461. The entire discussion between Adams and Shemroske was about Adams' tardiness. ROA.2266

On 11/7/18, five days after Shemroske gave Adams her second PIP, it was reviewed by Shemroske with Adams, and Shemroske used this occasion to give her a Final Written Conduct/Behavior Disciplinary Action with a one day suspension. ROA.1246. Lakeview did not follow the progressive discipline policy when it went straight to Final Written, skipping Verbal and Written levels. The incident involved Adams' conduct as reported by Diane Leonard, who felt disrespected by Adams. There were three employees in the Blood Bank having a friendly conversation with laughing and joking. They were Adams, Lauren Bacon-Romano, and Steven Brown. Diane came in to complain about some specimens that had just been dropped off at the front desk. When Diane, Steven, and Lauren started to leave the Blood Bank, Diane turned around to make some comment to Adams. At that time Adams made an inappropriate hand gesture at her side while laughing. The hand gesture was

meant as a joke between Adams and Lauren. Diane assumed it was meant for her and was offended. Adams intended no disrespect. Adams wrote in the employee comments section: "Hand gestures were not made to, at, or about the coworker and laughter of several people was not at or about the coworker." ROA.1246.

Shemroske mentioned the attendance PIP in this write up; however, only attendance was discussed in the PIP meeting five days earlier. ROA.2265, 2266.

On 11/12/18, Adams made an error in Blood Bank. On 11/13/18, there was a discussion with Katie Grams-McGovern, Julie Fast-Winston, Janelle Shemroske and Adams about the error. Adams was extremely upset that she made this mistake.

After the meeting about Adams' error in Blood Bank, Adams was still very upset. Katie Grams-McGovern, Adams' former Blood Bank section supervisor, attempted to calm her down before she went back to work by talking about how everyone occasionally makes an error, including herself. She explained to Adams that there are systems in place to ensure the occasional error does not harm patients. Katie mentioned several of her personal incidents, including one where she forgot to screen units for an antigen to transfuse a patient with an antibody. Adams had already taken off the next three days because Adams had a procedure scheduled. Katie was going to come up with an action plan so that Adams could continue to work in Blood Bank.

On 11/13/18, Grams-McGovern emailed Shemroske regarding the discussion

with Adams. In this email, Grams-McGovern stated that Adams would not be working in the Blood Bank until further assessment is done. She had discussed with Adams what kind of schedule might accommodate Adams' physical needs. Also discussed was the option to have co-signers or mentors for Adams. ROA.230.

When Adams returned to work on 11/16/18, Shemroske took Adams to HR for a discussion with herself, Katie Grams-McGovern, and Chris Atkinson. Shemroske gave Adams  Disciplinary Action Final Written Warning for Performance and Patient Safety. Shemroske wrote Adams up for something Shemroske described as a grave patient safety concern. This is not the case. The error was caught and corrected before it could possibly cause harm to a patient and no incident report was submitted.  Lakeview requires an incident report whenever there could be a risk of harm to a patient. ROA.2267, 2268.

On January 11, 2018, Shenmroske gave Adams a Written Disciplinary Action for attendance. The offense for this discipline was 6 attendance points for tardy occurrences from 10/12/18 until 1/9/19. This disciplinary action also included the next steps provision that "failure to demonstrate immediate, significant and sustained improvement will result in additional disciplinary action up to and possibly including termination of employment." ROA.363. Again, this is for a period that Shemroske would not let Adams use her FMLA leave for tardy occurrences, as stated on Shemroske's latest PIP. ROA.2460.

Shremroske told Adams her illness related tardy occurrences were not covered by FMLA. As a result, Adams did not apply for FMLA leave and Shemroske disciplined Adams for her illness related tardy occurrences.

Shemroske required Adams to use her FMLA in 30-minute increments or higher. However, FMLA regulations require time keeping be in the shortest increments used by the employer, which for Lakeview, is 15 minutes. ROA.2279. Adams was upset that she had been told to use her FMLA in 30-minute increments not only because it used up her FMLA leave, but it also necessitated that she be away from work, when she could have clocked in and started working, which situation increased tension with coworkers. ROA.2263.

Lakeview required Adams to use her PTO to cover FMLA. Adams asked Lakeview to comply with the FMLA and put this requirement in writing. This was a real concern for Adams because she needed to take a few days off for a procedure and her FMLA leave was depleting her accrued PTO. Also, Shemroske had made a point of calling Adams on a scheduled day off, 10/4/18, to tell her that she needed to come into work because she did not have enough PTO to cover the day off. ROA.2567. Adams did not come into work, as she had made a lengthy afternoon doctors' appointment that day, since she tried to schedule those on her days off instead of asking off work. ROA.2264.

**C. Incident of July 25, 2019, until EEOC Notice of Right to Sue**

In July of 2019 Adams was taking Benadryl daily because of an exacerbation of her symptoms, most likely due to high pollen count. On July 25, 2019, Adams woke up with a migraine around 5am and began taking Benadryl according to this schedule.  Around 11:20 Adams's symptoms had subsided enough for her to safely drive to work. Adams clocked in at work around 11:45 and proceeded to perform testing in her department. Adams continued to take Benadryl while at work with approximately 4 hours between doses as the workload allowed. ROA.2273.

Around 4:30, after the Blood Bank technologist Dayna Pico asked Marsha Aucoin to help her, Janelle Shemroske then came out of her office to ask Marsha Aucoin to go into Blood Bank.  Marsha refused to go into Blood Bank. Shemroske then came to Adams to ask her to go into Blood Bank.  At this time, when Adams was first asked to change job assignments, she told Shemroske that she had not been feeling well and had been taking Benadryl. Adams then stated that she did not feel comfortable moving into Blood Bank at the time.  Adams did offer to work in Chemistry as well as continuing to work in her section.  Shemroske then turned to Marsha and asked for the third time for Marsha to go work in Blood Bank. Adams thought the matter had been resolved and continued to work. After about 15 minutes Shemroske pulled Adams into her office and told her she was being sent home for being under the "influence" of Benadryl. Adams asked to stay and continue doing the work she had been doing for the last 5 hours. Adams told her that she felt

perfectly capable of continuing to work in her department Urinalysis/Serology and to continue to cover Chemistry until Marsha was finished in Blood Bank. Shemroske insisted that Adams clock out and go home. Since Shemroske would not allow her to continue working because of her illness and medication, Adams called in a FMLA absence for the remainder of that day. ROA.2273,2274.

Adams came in to work as usual the next day. In between testing Adams drafted an email to Hiral Patel detailing the events that took place on 7/25/19. In the email Adams stated that she routinely took Benadryl at work and felt confident that she could perform her work while doing so. Adams also stated that most of the time she feels very comfortable performing high complexity testing such as Blood Bank. ROA.961.

On 7/29/19, Adams met with Atkinson and Shemroske. During this discussion Atkinson asked how much Benadryl Adams had taken on the day of 7/25/19. Adams replied that she had taken 300mg and tried to explain her medication schedule. By 300mg Adams meant that she had taken several doses of Benadryl from the time she woke up around 5AM until the time she went to sleep around 10pm. They also discussed the different levels of complexity involved in lab work. Despite their conversation and the fact that Adams wrote to Hiral Patel that not only was she capable of performing her work on 7/25/19, she was perfectly capable of performing high complexity testing such as Blood Bank the majority of the time, there were

emails exchanged between the two HR employees King and Atkinson questioning whether they could assume that Adams was incapable of working. After the discussion with Atkinson, Adams went back to work and worked her regular schedule through 7/30/19. On the morning of 7/31/19, Shemroske called to inform her that Adams should not come into work because Adams had been placed on paid administrative leave pending an investigation. ROA.2274,2275.

On 8/9/19, Adams was terminated by Shemroske and Atkinson. Shemroske started the meeting by saying that she had asked Adams to go into the Blood Bank department. Shemroske then proceeded to state that Adams had told her that the amount of over-the-counter medication prohibited her from being able to do that job, which Adams had never said. Then Shemroske stated that the investigation determined that Adams violated the Substance Abuse Policy. Adams had not violated any part of the Substance Abuse Policy, since she had informed Shemroske of her illness and medication as soon as she was asked to change departments that day. The misinformation continued on the Corrective Action form when they implied that Adams "later" attempted to excuse herself because of the medication and that Adams stated that she was impaired. Both of those facts were not true. Atkinson and Shemroske kept insisting that the decision was final, so Adams thought she had no choice but to accept her termination as final, although she did write an explanation on the termination form about the untrue facts. ROA.2275, 2561-2563,

215.  Adams, in the employee comments section, wrote on her termination disciplinary action, "My supervisor was well aware of my antihistamine use. I never stated that I was so impaired as not to be able to perform my duties. I asked to be able to continue with my duties that evening and was sent home." ROA.215

## II.    Procedural History

On 8/9/19, Lakeview fired Adams. ROA.214. Adams filed her questionnaire the next day with the EEOC. ROA.203. The next month Adams filed her charge of discrimination. ROA.228. The EEOC issued a Notice of Right to Sue on August 10, 2020. ROA.235. Adams then timely filed her complaint on November 7, 2020. ROA.13.

On 12/28,20, Lakeview filed a motion to dismiss two of Adams' claims. ROA.35. The district court granted that motion on February 1, 2021, dismissing Adams' claims for failure to accommodate and failure to engage in the interactive process. ROA.85.

Adams timely filed a Motion for Reconsideration on February 9, 2021.  The district court granted the Motion for Reconsideration on March 3, 2021.

Lakeview filed its second motion to dismiss on March 15, 2021, to dismiss the same two claims. ROA.180. The district court granted that motion on April 8, 2021, again dismissing Adams' claims for failure to accommodate and failure to engage in the interactive process.ROA.271.

The district court granted Lakeview's motion for summary judgment on June 3, 2022. ROA.2939. Judgment was entered on June 3, 2022, dismissing all Adams's claims with prejudice. Adams filed her notice of appeal on June 25, 2022.

## SUMMARY OF THE ARGUMENT

Lakeview has not contested the fact that Adams is a person with a disability as defined under the ADA and a person with a "serious health condition" as defined by the FMLA. Adams has Mast Cell Activation Syndrone (MCAS). Lakeview fired an 11-year employee whose disability was getting worse, allegedly for violating the substance abuse policy of the company. The problem with that explanation is that Adams does not abuse any substance. Lakeview allegedly fired her for not notifying her supervisor whenever she is taking an over-the-counter drug that she has been advised or based upon the drug profile may impair job performance (e. g. drowsiness or diminished ability to focus).

Adams was having a difficult day with her disability and took over-the-counter Benadryl as prescribed by her physician and as directed by the dosage on the Benadryl package. Adams was the section supervisor for the department Urinalysis/Serology at the Laboratory at Lakeview hospital. About 5% of her time she is asked to work in the Blood Bank. That involves high complexity work and a higher level of concentration. After Adams had been at work for 5 hours that day her

supervisor asked a coworker to go into the Blood Bank. This coworker refused to go, saying that it was Adams turn to go. When the supervisor asked Adams to go, Adams told her that she wasn't feeling well, had been taking Benadryl and did not feel comfortable moving into the Blood Bank then. Adams offered to continue in her section and also cover the Chemistry section so a coworker could go to the Blood Bank. The supervisor had been her supervisor for years and knew that Adams took Benadryl all the time. Adams was fired because of her disability and because of her use of intermittent FMLA leave. Also, Lakeview interfered with Adams' FMLA rights by denying her the right to use FMLA leave for tardy occurrences caused by her serious health condition.

For a person with such a health condition, Lakeview must afford her both her FMLA and ADA rights. FMLA entitles eligible employees to 12 weeks of leave in any 12-month period due to their own serious health condition, whereas the ADA allows an indeterminate amount of leave, barring undue hardship, as a reasonable accommodation. Also for a period of time, until Adams complained about it, Lakeview did not allow her to take her FMLA leave in 15 minute intervals, which is the interval Lakeview uses for its other leaves. This caused her to use up her FMLA leave and her PTO, which Lakeview required be used for FMLA leave. This also caused her to miss more work than she had to miss.

## ARGUMENT

### I. **Standard of Review**

A grant of summary judgment is subject to *de novo* review. *DePree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009). *Mozingo v. Oil States Energy, Inc.*, 661 F. App'x 828, 3 (5th Cir. 2016).

A grant of a Rule 12(b)(6) motion to dismiss is also subject to *de novo* review. *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007). " *Bradford v. Law Firm of Gauthier, Houghtaling & Williams, L. L.P.*, No. 17-30037, at *5 (5th Cir. June 22, 2017)

Similarly, a district court's determination that a plaintiff failed to exhaust administrative remedies is reviewed *de novo*. *Ruiz v. Brennan* , 851 F.3d 464, 468 (5th Cir. 2017). *Equal Emp't Opportunity Comm'n v. Vantage Energy Servs.*, 954 F.3d 749, 753 (5th Cir. 2020).

The standard of review for denying a motion for leave to file a surreply is abuse of discretion. *RedHawk Holdings Corp. v. Schreiber Tr. ex rel. Schreiber Living Tr.*, 836 F. App'x 232, 235 (5th Cir. 2020) (per curiam).

### II. **Summary Judgment Standard and 12(b)(6) Motion to Dismiss Standard**

"Under the ordinary summary-judgment standard, the party who moves for summary judgment bears the initial burden to show "that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant, based on the burdens that would apply at trial. For a defendant, this means showing that the record cannot support a win for the plaintiff—either because the plaintiff has a failure of proof on an essential element of its claim or because the defendant has insurmountable proof on its affirmative defense to that claim. The defendant can show this by introducing undisputed evidence or by "pointing out ... an absence of evidence to support the [plaintiff's] case." If the defendant succeeds on that showing, the burden shifts to the plaintiff to demonstrate that there *is* a genuine issue of material fact and that the evidence favoring the plaintiff permits a jury verdict in the plaintiff's favor." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020)

The Fifth Circuit has held that it "may affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 438 (5th Cir.2012) (citation and internal quotation omitted). *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016). Therefore, in this case the Fifth Circuit may reverse a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court.

The standard for considering a Rule 12(b)(6) motion to dismiss is to accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff. *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007)." *Bradford v. Law Firm of Gauthier, Houghtaling & Williams, L. L.P.*, No. 17-30037, at *5 (5th Cir. June 22, 2017)

**III. Lakeview interfered with Adams' FMLA rights. After Adams' intermittent FMLA leave was approved, Lakeview disciplined Adams for incidents when her illness caused her to be tardy when arriving at work. Lakeview violated the FMLA and its own company policy when it denied or discouraged Adams' use of her FMLA leave for these occasions of being tardy.**

To prove an interference claim under the FMLA, "a plaintiff 'must at least show that [defendant] interfered with, restrained, or denied [her] exercise or attempt to exercise FMLA rights, and that the violation prejudiced [her]." *Acker v. General Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (citing *Bryant v. Tex. Dep't of Aging & Disability Servs.*, 781 F.3d 764, 770 (5th Cir. 2015)). Interference "includes not only refusing to authorize FMLA leave but also discouraging an employee from using such leave." *Park v. Direct Energy GP*, *L.L.C.*, 832 Fed. Appx. 288, 290 (5th Cir. 2020) (citation omitted) (unpublished). "An interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA." *Id.* (citing *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)).

For an employee to establish a *prima facie* FMLA interference claim, the employee must show that she was an eligible employee; that her employer was subject to FMLA requirements; that she was entitled to leave; that she gave proper notice of her intention to take FMLA leave; and that her employer denied her the benefits to which she was entitled under the FMLA. *DeVoss v. Southwest Airlines Company*, 903 F.3d 487, 490 (5th Cir. 2018). Finally, if such a violation is found, Plaintiff must show "that the violation prejudiced her." *Bryant v. Texas Dept. of Aging and Disability Services*, 781 F.3d 764, 770 (5th Cir. 2015) (citation omitted). *Erickson v. Penn Nat'l Gaming, Inc.*, CIVIL ACTION No. 19-00451-BAJ-EWD, at *4-5 (M.D. La. Mar. 25, 2021

There is no dispute concerning the first four elements of the prima facie case of FMLA interference. The issue is whether Lakeview denied Adams benefits to which she is entitled under the FMLA. And then Adams must show how the denial of benefit prejudiced her.

In the case of *Sherman v. Christus St. Michael Health Sys.*, No. 5:11CV92, at *1 (E.D. Tex. Aug. 17, 2012), the district court upheld the Magistrate's ruling that tardy occurrences are protected by the FMLA.

Also, *Title 29, Subtitle B, Chapter V, Part 825 - The Family and Medical Leave Act of 1993, 825.220 (c)* states that employers cannot use FMLA leave as a negative

factor in disciplinary actions; nor can FMLA leave be counted under attendance policies.

Also, the company policy HR.ER.001 on Attendance and Tardiness states in paragraph 4 that "tardiness occurs when an employee fails to report for duty at the time outlined in his or her shift and or fails to return to duty promptly at any point during his/her normal shift. This excludes tardiness protected by federal state or local regulations such as Family Medical Leave Act (FMLA) and the Americans with Disabilities Act, amended (ADAAA). ROA.930,931.

Therefore, when Shemroske denied Adams her right to use her FMLA leave for her tardy occurrences, in the two PIPs of 10/9/18 and 11/2/18, Lakeview violated the FMLA. ROA.2459, 2460. Adams was prejudiced by this violation because she was disciplined twice for tardy occurrences during this period. ROA.1339, 363. On both of these disciplinary actions, Shemroske threatened that failure to improve will possibly result in termination of employment.

Also, these two disciplinary actions were mentioned in the company position statement to the EEOC as justification for the termination of Adams. ROA.219. Defendant claims that the attendance write-ups were not a factor in Adams' termination because this information is in a footnote. However, it is in the position paper for a reason. That is to discredit Adams and to convince the EEOC that it had non-discriminatory reasons to fire Adams. This prejudices Adams.

After Shemroske agreed that Adams could use her FMLA leave for tardy occurrences and after Lakeview agreed that Adams could take her leave in 15 minute increments, instead of 30, Adams used her FMLA leave in that fashion. For example, on 1/15/19, 2/23/19 and 2/26/19, Adams took FMLA leave for 15 minutes each day. ROA. 811, 829, 830.

However, Shemroske continued to find ways to restrict Adams' use of his FMLA leave. In an email to Atkinson on 6/4/19, Shemroske expresses her concern that excused tardiness by Adams' FMLA leave is too extensive and suggests requesting more information from Dr. Olivier. She also asks if the 0-episode designation means that tardiness is not excused. In this email she states that the majority of Adams' tardy occurrences are for 15-30 minutes. ROA.1284.

Also, on 7/25/19, Shemroski emailed Atkinson that Adams took FMLA leave for the 3 hours and 30 minutes that day for the time Adams missed after Shemroski sent Adams home. She is again questioning Adams' use of her FMLA leave. ROA.949.

**IV.    Lakeview interfered with Adams' right to have her intermittent FMLA leave calculated in 15-minute intervals and her right to receive written notice that her FMLA leave would be charged against her PTO.**

Another interference claim is that Adams was forced to use 30-minute intervals for timekeeping of her FMLA leave when the Defendant uses 15-minute intervals for the rest of its timekeeping for other types of leave.

An employer cannot discouraged an employee from taking smaller leave increments in violation of 29 C.F.R. § 825.205(a)(1) (ECF No. 60, pg. 9). The Regulation provides, in relevant part, as follows:

"(1) When an employee takes FMLA leave on an intermittent or reduced leave schedule basis, the employer must account for the leave using an increment no greater than the shortest period of time that the employer uses to account for use of other forms of leave provided that it is not greater than one hour and provided further that an employee's FMLA leave entitlement may not be reduced by more than the amount of leave actually taken. An employer may not require an employee to take more leave than is necessary to address the circumstances that precipitated the need for the leave, provided that the leave is counted using the shortest increment of leave used to account for any other type of leave." *Barrasso v. Children's Hosp. of Pittsburgh* , Civil Action No. 17-0267, at *22-23 (W.D. Pa. Jan. 28, 2019)

Adams was upset that she had been told to use her FMLA in 30-minute increments not only because it used up her FMLA leave, but it also necessitated that she be away from work, when she could have clocked in and started working, which situation increased tension with coworkers. ROA. 2263. Adams promptly reported this FMLA violation to Shemroske. ROA.2279.

Adams has been prejudiced by having to use more leave time than was necessary. She will be seeking damages as was sought in the case below:

This is because the Town of Marlborough began allowing Mr. Foley to take FMLA leave in increments after it was informed by the DOL that it was required to do so. *Id*. at 41-42. It also paid him for the time he would have worked if he had not been required to take full days of leave, and it returned that time to his "FMLA leave bank." *Id*. at 42.

*Foley v. Town of Marlborough*, 3:19-cv-01481 (VAB), at *55 (D. Conn. Aug. 29, 2022)

Because of Lakeview's policy of requiring all FMLA leave to first use up an employee's paid PTO, Adams complained about running out of PTO. For example, Shemroske called Adams on 10/4/18, on Adams' day off, to tell her that she was out of PTO and could not take a day off. ROA.2567.

On 10/1/18, Adams called in with a migraine, but had insufficient PTO to stay home. ROA.742. On 2/6/19, Adams needed 8 hours of FMLA for her mother's illness. She did not have sufficient PTO to cover it. Therefore, after that day off, partially covered by PTO and partially unpaid leave, Adams had no remaining PTO. ROA.820, 1315.

Because of Lakeview's policy, which prejudiced her because it took away her ability to have an occasional day off, Adams did request that Lakeview comply with FMLA and give her written notice of its policy. ROA.2428. 29 C.F.R. § 825.300. The damages for failure to follow the notice requirements are actual monetary losses or appropriate equitable relief. 29 C.F.R. § 825.300. Lakeview did not provide that written notice.

In January 2019 Adams inquired about the use of PTO for FMLA leave. In June Adams was still inquiring about the same subject. She also inquired about the requirement of written notice. ROA. 2122,2065, 2501.

## V. Lakeview violated the FMLA when it fired her for using or attempting to use her FMLA leave.

Although the district court in footnote 1 of its opinion, states that FMLA retaliation was never pled, ROA. 2943, Adams alleged in her complaint that Lakeview violated the Family and Medical Leave Act when it fired Adams when she was on intermittent FMLA leave. ROA. 21, paragraph 61.

Adams has all of the claims stated in her complaint that have not been dismissed by this Court on April 8, 2021. Those two dismissed claims are Adams' ADA claim of Defendant's failure to accommodate and Adams' ADA claim of the Defendant's failure to engage in the interactive process. None of Adams' FMLA claims have been dismissed by this Court. Defendant is incorrect in trying to limit in any way Adams' FMLA claims.

Adams pleaded a FMLA retaliation claim, contrary to the assertion of Defendant. In an attempt to limit Adams' FMLA claims, Defendant has selected part of an unnumbered introductory sentence in Adams' complaint and ignored the specific language in the complaint that clearly sets forth Adams' FMLA claims.

The federal courts follow the notice standard of pleading that requires the plaintiff to give the defendant fair notice of what is being asserted against it. Adams has done that in this case.

Fair notice is required to properly state a claim. "Although the Federal Rules allow for a liberal pleading standard, they "do contemplate that the pleadings will refer to the occurrences sued upon and that they will show that the pleader has a claim on which he or she is entitled to relief" and give the defendant "fair notice of what is being asserted against him." *Herster v. Bd. of Supervisors of La. State Univ.*, 221 F.Supp.3d 791 (M.D. La. 2016). Adams has done that in this case. Adams is requesting that this court apply the liberal pleading standard and allow Adams to submit her FMLA claims in their entirety as pleaded, which include being fired for her FMLA activity.

In her 12-page complaint, Adams starts with the Nature of the Action with a summary sentence that is an overview of her claims was not intended to limit her claims. It states:

**As alleged with greater particularity below** (emphasis added), Lakeview discriminated against Adams when it terminated her employment because of her disability, failed to engage in an interactive process to provide a reasonable accommodation for her disability, and interfered with her rights under the FMLA. ROA.13.

In her complaint, Adams is more specific about her FMLA claims in the numbered paragraphs of the complaint that follow the introductory

sentence and follow the particular ADA claims. ROA.20-22.

By making these allegations in her Complaint, she has put Defendant on notice that her claims include the claims that Defendant violated Adams' FMLA rights protected by 29 CFR § 825.220 including (1) interfering with, restraining or denying the exercise of any rights protected by the FMLA and (2) discharging or in any other way discriminating against her for opposing or complaining about any unlawful practice under the FMLA.

Paragraphs 53-59 claim that Adams was eligible for FMLA leave, gave notice of her intent to take FMLA leave, was denied benifits under the FMLA, and Defendant interfered with her using her FMLA leave. ROA.20,21.

Paragraph 60 claims that Adams informed Shemroske about taking FMLA leave for an absence, and nevertheless, being disciplined for that FMLA absence. That disciplinary action was used as a reason to fire Adams. Also paragraph 61 indicates that Defendant fired Adams when she was on intermittent FMLA leave. ROA.21.

Paragraphs 62-66 and 68 are allegations that state that the reasons for the termination are false and a pretext for discrimination and retaliation. ROA.21,22.

The Court did dismiss the two ADA claims, which are also subject to this appeal, the district did not rule on limiting any FMLA claims. ROA.278.

In the even Defendant claims that Adams has voluntarily given up any claims, that would be incorrect.

Violations of the FMLA include FMLA retaliation and violations other that FMLA interference.

Defendant violated the FMLA when it fired her when she was on FMLA leave. Also, Adams claims that she was fired because she was disciplined for taking FMLA leave in violation of the FMLA. Adams claimed that she was fired in violation of the FMLA in her opposition to motion for summary judgment after making that claim in her complaint. ROA.2245-2247. Adams gave fair notice that she is claiming that she was fired because of FMLA violations and because she brought these violations to the attention of the Defendant. Adams brought the claims of FMLA violations to Defendant after she was approved for FMLA intermittent leave. They are claims that tardy occurrences are covered by FMLA leave, the appropriate time interval for FMLA leave at Lakeview is 15 minutes, and Lakeview must give written notice if it requires FMLA leave to be covered by PTO.

**VI.    Lakeview violated the ADA when it discriminated against Adams because of her disability when it disciplined her and when it fired her**

The district court erred when it did not continue the inquiry after it concluded that Adams failed to demonstrate pretext. Under the ADA, "discrimination need not be the sole reason for the adverse employment decision ... [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative

influence on the outcome" *See Pinkerton v. Spellings,* 529 F.3d 513, 519 (5th Cir.2008) (citation and internal quotation marks omitted). For this reason, an employee who fails to demonstrate pretext can still survive summary judgment by showing that an employment decision was "based on a mixture of legitimate and illegitimate motives ... [and that] the illegitimate motive was a motivating factor in the decision." *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 355 (5th Cir.2005) (internal quotations omitted).

*Equal Employment Opportunity Commission v. LHC Group, Inc.*, 773 F.3d 688, 702-03 (5th Cir. 2014).

Because Adams is a qualified individual with a disability within the meaning of the ADA, Lakeview must make reasonable accommodations, etc., barring undue hardship, in accordance with the ADA. Adams received disciplinary actions for errors in the Blood Bank and her comparator Team Lead A committed a more serious infraction and was not give a disciplinary action. ROA. 2268. Doc.61 Ex. N 779.

Lakeview has changed its reason for terminating Adams. The Disciplinary/Corrective Action Form dated August 9, 2019, states that Adams is terminated because she violated the substance abuse policy. ROA.214.

Lakeview's Position Statement to the EEOC stated that Adams' claim that she was fired for violating Lakeview's substance abuse policy was without merit. It stated that she was fired because she refused to work in the blood bank. ROA. 219.

In addition to the company taking two opposing positions as to whether Adams was fired because she violated the company substance abuse policy. Lakeview claims that Adams refused to perform Blood Bank duties. ROA. 214, 219. This is not true. Adams did not refuse to perform Blood Bank duties. ROA.2296. She testified that she did not feel comfortable going into the Blood Bank at that time. Adams suggested the alternative of staying in her department and taking over the Chemistry Department and that is what happened. ROA.2298.

In order to treat the symptoms of her disability that day, by the time she had her conversation with Shemroske on the July 25th, Adams had taken 250 mg of Benadryl. By the end of the day, she had taken 300 mg. Adams told Atkinson in a later meeting that she had taken 300 mg of Benadryl that day, meaning the entire day, starting at 5:00 am. ROA.2299,2300.

The amount of over-the-counter Benadryl that Adams took that day is the exact amount that her physician prescribed. It is also the amount of Benadryl that is listed on the Benadryl website as the proper daily dosage. Specifically, it states "50 mg every 4 hours, with a maximum of 300 mg per day."

https://www.benadryl.com/products/benadryl-extra-strength-allergy-ultratabs.

The district court erred in citing the company documents as if they were true when Adams specifically denies the truth of the matters. For example, the district court cites verbatim the Lakeview termination disciplinary action, ROA.214,

2944,2925. This document claims that Adams refused to perform her duties in the Blood Bank and that Adams admitted that she was too impaired to perform the essential functions of her job. Adams testified that those statement are false. ROA.214.

The allegations in the termination disciplinary action were refuted at the termination meeting by Adams in the employee comments section. Adams wrote, "My supervisor was well aware of my antihistamine use. Adams never stated that Adams was so impaired as not to be able to perform her duties. Adams asked to be able to continue with her duties that evening and was sent home." ROA.215.

Adams refuted the allegations of termination disciplinary action at the termination meeting as recorded.

Virginia Adams (05:46):
Okay. So just to make this clear, you're terminating me because I took a medication that I need to take for my disability?
Janelle Shemroske (05:55):
Because of the amount of- ROA.2561.

This response by Shemroske confirms that Adams was fired because of the amount of medication she took that day.

The following quote confirms that Adams did not refuse to do her job.

Virginia Adams (06:09):
I'm sorry, but I didn't later attempt to say that I refuse to do blood bank because I said it right then and there that I did not feel comfortable doing high complexity testing as defined by the FDA. Not that I was refusing to do my job.ROA.2561.

Shemroske agreed that Adams stated that she felt perfectly comfortable doing the moderate and low complexity testing that she had been doing that day. ROA.2562.

Adams also said:

Virginia Adams (07:18):
So because I said I was uncomfortable doing a single part of my job, you're firing me because of a medication that I have to take for my disability.

Chris Atkinson (07:26):
This states explicitly why you're being terminated.

Virginia Adams (07:38):
I did not say that I was too impaired to perform the essential functions of my job.

Chris Atkinson (07:44):
Yeah. As I said, the decision is final Virginia.

Virginia Adams (07:53):
No, that's fine. I just want to have it on record that this is a false statement that you have written down that you say that I said.

Chris Atkinson (08:02):
There is a place on the second page if you want to make some notes I'd be happy to do that.

Virginia Adams (08:19):
Absolutely. And you're saying it's a conduct of behavior and not of performance.

Virginia Adams (08:44): None of this is what I said. ROA.2562.

Virginia Adams (09:04):
My statements clearly indicated that I believe myself to be impaired at the time in question that I could not perform my job. That is entirely false.

Janelle Shemroske (09:16):
Your job is the whole job function of the day, not just pieces of the job.

Virginia Adams (09:47):
You know I take Benadryl all the time.

Janelle Shemroske (09:49):
You stated an excess amount that day because of your symptoms. That's the main thing that runs in the substance abuse policy. ROA.2563.

First, we examine to see if there is direct evidence of disability discrimination. Using the criteria set forth in *Kitchen v. BASF*, 952 F.3d 247 (5th Cir. 2020), the Fifth Circuit has held in an ADA-termination case that evidence is direct when, if believed, it proves the fact of "discriminatory animus without inference or presumption." *Rodriguez v. Eli Lilly & Co.* , 820 F.3d 759, 765 (5th Cir. 2016) (quoting *Sandstad v. CB Richard Ellis, Inc.* , 309 F.3d 893, 897 (5th Cir. 2002) ).

The question for the trier of fact is whether being fired for the amount of medicine being taken for your disability is direct evidence of being fired because of your disability. And, in this case, the amount of medicine taken is equivalent to the safe dosage of the over-the-counter medicine, set by the manufacturer.

Also, if her attendance was a factor in her termination and the attendance is directly related to her disability, that is more evidence that her disability was a motivating factor in her discharge. Adams' supervisor made a list of issue she had with Adams. Two of the five items were attendance. ROA.2423.

An email exchange between Atkinson and King questioned Adams' FMLA

leave use and concluded that Adams was inside her certification and approved for FMLA through October 2019.  The exchange ended with the statement "I'm not sure where we go from here". ROA.1831. On 7/26/19 there was another email exchange between the two HR employees King and Atkinson detailing correcting the use of Adams's PTO and the process of asking for a second opinion for her FMLA certification. In another email Atkinson proclaims that if Adams cannot perform safely in the Blood Bank, then should they assume that she cannot perform safely in other parts of the lab. ROA. 1503.

In contrast to her Corrective Action of termination, "Medical Laboratory Technician D" was given a Corrective Action in HR at a verbal level, even though she had refused to go into Blood Bank multiple times when asked that day. There were some question about if it was even necessary to discipline "Medical Laboratory Technician D" for the incident in an email between King and Atkinson. Doc. 61 Ex. N 212.

As a result of her termination and the abrupt end of her medical benefits, Adams was never able to make an appointment with the Mast Cell Disease specialist Dr Glover and her diagnosis and appropriate treatment were unfortunately delayed. ROA.2276.

In the alternative, should the Court decide that this is not enough evidence to show direct evidence of discrimination, we move to the McDonnell Douglas analysis.

Adams accepts the framework of this analysis put forth by the Defendant on page 15 of its Memorandum: a plaintiff must make a prima facie case of discrimination by showing: (1) she has a disability; (2) she was qualified for her job; and (3) she was subjected to an adverse employment decision because of the disability. Even if an employee manages to state a prima facie case of discriminatory discharge, if the employer produces any evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," the employer has satisfied its burden of production and "[t]he burden then shifts back to the employee to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual."

Adams is an individual with a disability. That has been conceded by the Defendant. However, Defendant claims that Adams is not a qualified individual with a disability because it claims that Adams cannot perform the essential function of the job, with or without accommodation. Adams only spends 5% of her time in the blood bank, Section supervisors usually spend no time in the blood bank. Also, with accommodation, Adams can perform the functions of her job. Even on that day July 25th, Adams had proposed an accommodation. In addition to running her section, she

was also supervising the section of the person, who did work the blood bank. In looking at the four factors to determine if a function is essential, two of the factors weigh in favor of Adams.

(1) the employer's judgment as to which functions are essential- this factor should be discounted because it is so subjective and self-serving for the employer.

(2) written job descriptions prepared before advertising or interviewing applicants for the job, - this factor should also be discounted because the job descriptions are voluminous and inaccurate. They are 19 pages long and double as a performance appraisal form. It has Blood Bank on the job description. ROA.2334-2352.

Does a section supervisor have to spend time outside of their assigned section? In fact, the Hematology, and Chemistry Section Supervisors were not required to obtain competency to be able to work in Blood Bank. ROA.2261-2262.

Although Blood Bank is listed in the same fashion on the Lead Tech, Medical Technologist, and Medical Laboratory Technician job descriptions and competencies, it is not required of every employee. Just as the Microbiology department is listed on each of the previous job descriptions yet microbiology is no longer performed at Lakeview. ROA.2262.

(3) the amount of time spent on the job performing the function, Adams only spent 5% of her time in Blood Bank. ROA.2262.

(4) the work experience of both past and current employees in the job." Upon

information and belief, the Urinalysis/Serology section supervisors prior to her were not required to obtain competency in Blood Bank either.

All inferences are drawn in favor of the non-moving party. There is at least a material issue of fact to go to the jury here.

The third element of the prima facie case is, was she was subjected to an adverse employment decision because of the disability. She was fired. That is the adverse action. Was it because of her disability? Her disability is involved. If it wasn't because of disability, she would not have been medicating to treat the symptoms that day. Another issue of fact for the jury. There is more evidence here. The comparators of the rest of the laboratory employees who are all supervised by Shemroske.

There are several technologist who have made errors in Blood Bank similar or more egregious than the mistake that Adams made without the mistake being written up as a HR Corrective Action disciplinary document.

In comparison there was an incident where "Team Lead A" the Blood Bank supervisor reported out a Type and Screen as negative when the patient's screen was actually positive and required additional testing to find out what antibody the patient had so that appropriate units of blood could be tested for her transfusion. This error was later found and corrected by a second blood bank technologist. "Team Lead A" had to notify the patient to return to Lakeview have more blood drawn. This error

was just as serious as the error Adams had made. Yet this error was not brought to the level of a HR Corrective Action. ROA.2268. Doc.61 Ex. N 777-782. ROA.2198.

In addition to that error, "Team Lead A" made another mistake while labeling units of blood to be transfused. The mistake was caught and corrected by another technologist. This error was also not brought to the level of a HR Corrective Action. ROA.2269, ROA.2281.

In addition to those two errors, Adams had herself caught another one of "Team Lead A"'s mistakes in blood bank. To the best of her recollection this incident occurred toward the end of 2018. Adams had found the error in Blood Bank performed by "Team Lead A" where she labeled a unit of plasma to be transfused for the wrong patient. Adams brought the error to "Team Lead A"'s attention and she said she would write it up. There have been no documents pertaining to this mistake provided by Lakeview So not only was this error not brought to the level of an HR corrective action, it also was not written up on a internal laboratory competency assessment form. ROA.2268, 2269.

Then there is the Blood Bank error performed by "Medical Technologist B" where she reported out an incorrect patient antigen type as part of a patient's positive antibody testing. The patient tested positive for an Anti-M antibody and was tested and reported out incorrectly to be positive for the M antigen. Although a patient can develop an autoantibody to an antigen on their own blood it is uncommon. Adams

is not sure how this error was discovered, but it was discovered and the action taken on "Medical Technologist B" assessment document was "Fast-Winston discussed with "Medical Technologist B". This error was also not brought to the level of a HR Corrective Action. In addition to her errors in Blood Bank "Medical Technologist B" also had errors in other departments that were written on assessment documents. Again, none of these errors were brought to the level of a HR Corrective Action. ROA.2269,2270, Doc.61 Ex. N 786, 793, 795.

Then there are the multiple mistakes in Blood Bank performed by "Medical Technologist E". The first mistake was an error in reporting out the patient's blood type. Although the competency document for this is unsigned it does state that Janelle informed "Medical Technologist E" that she is not to work in Blood Bank until she completes the competency exorcises with Julie dated 7/16/16. Also on 7/16/16 "Medical Technologist E" made an error were she took a patient who had a positive antibody screen on the Blood Bank instrument and ran the antibody screen by hand then reported it out as negative. This was not a simple clerical error. It was an error of performance and could, if not caught have, have resulted in harm to the patient. Fortunately the mistake was caught and corrected afterwards in the blood bank review. Another error is on an internal competency assessment document that is not signed or dated. It does mention "Medical Technologist E"'s statement in the 10/12/16 note. None of these errors were brought to the level of a HR Corrective

Action. Although there are no more documents pertaining to "Medical Technologist E"'s blood bank errors there is a competency assessment for "Medical Technologist E" signed by Shemroske on 8/1/17 stating that Medical Technologist E" will not perform Blood Bank procedures. None of her repeated performance issues in Blood Bank testing were brought to the level of an HR Corrective Action, including when it was decided that she would no longer be required or allowed to work in Blood Bank. ROA.2270, Doc.61 Ex. N 827,829,831,842.

In all the previous errors committed in Blood Bank not only by other technologists but also by the Blood Bank supervisor, not one was written up as a HR Corrective Action. Most of these errors were serious and had the potential to result in harm to a patient. Fortunately, there are systems in place to catch and correct human errors so that no harm is done to a patient. Not one of these other employees were written up as HR Corrective Actions much less brought to the HR personnel for a discussion and to sign a final written action for performance. ROA.2271.

After the meeting to discuss her blood bank error in HR, Shemroske suggested that Adams should step down from her lead tech position. When Adams declined, she brought up transferring her to Tulane across the lake since Adams would not have to work in Blood Bank. Both these actions would have been in violation of FMLA. It was at this point that Adams now believed Shemroske was discriminating against her because of her disability, her FMLA leave usage, and/or her complaints

about her FMLA rights. ROA.2271.

Then we move to the alleged non-discriminatory reason for termination. Defendant says it fired Adams for is violating the substance abuse policy of the company. The Defendant told the EEOC that it did not fire Adams because she violated the substance abuse policy. Adams did not violate any part of the substance abuse policy because she had informed Shemroske of her illness and medication as soon as she was asked to change departments that day. Adams did exactly what she was obligated to do under the substance abuse policy.

## VII.   The district court erred in dismissing the failure to accommodate claim.

The district court erred in not allowing the failure to accommodate charge to proceed based on the charge and the facts in this case. The last time that Defendant failed to accommodate Adams was when she asked for the accommodation of continuing to work in her section and not having to work in the Blood Bank for the last few hours of her shift on 7/25/19, when she had taken prescription Benadryl to alleviate the symptoms of her disability. This was a reasonable request because there was another employee to work in the Blood Bank and Adams had agreed to do that persons work and her own. In fact, that was the situation for a short while before Adams was sent home. The particulars of the charge include being

sent home from her work shift. ROA.228. The extensive description of the failure of Lakeview to accommodate her disability is in the questionnaire, which was the first submission to the EEOC, about a month before the filing of the charge. ROA.203-206.

ADA claims are different from other discrimination claims at the EEOC. In the definition of disability discrimination in the ADA is failure to accommodate the disability. Failure to accommodate a disability is included in the federal statute as part of the definition of discrimination on the basis of disability. In 42 U.S.C. § 12112- (b)(5)(A) Discrimination- the term "discriminate against a qualified individual on the basis of disability" includes-not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."

Therefore, when checking the box on the EEOC charge for disability discrimination, the claimant is including the failure to accommodate, which is included in the discrimination definition. There is no box for failure to accommodate a disability.

A failure to accommodate can be considered a second prong of a discriminatory discharge case. *Equal Employment Opportunity Commission v. LHC Group, Inc.*, 773 F.3d 688, 703 (5th Cir. 2014)

In the case of *Patton v. Jacobs Eng'g Grp., Inc*., 874 F.3d 437 (5th Cir. 2017), the Fifth Circuit overturned the district court holding that the plaintiff had failed to exhaust his administrative remedies for the failure to accommodate claim because the charge itself did not mention failure to accommodate. The Court held that the questionnaire that stated that the plaintiff had requested changes because of his disability and the company brushed him off, is considered part of the charge.

The Fifth Circuit found that Patton's intake questionnaire should be construed as part of the EEOC charge. The Court stated, "Thus, Patton did in fact "trigger the investigatory and conciliatory process.  Construing the scope of Patton's charge liberally, we hold that his failure to accommodate claim could reasonably be expected to—and in fact did—grow out of his charge of discrimination."

In the case at bar, the determination of whether the failure to accommodate claim could reasonably be expected to grow out of Adams' charge of discrimination can be decided upon an interpretation of the charge itself (outside the four corners of the charge), and/or an interpretation of the charge in conjunction with the questionnaire submitted with the charge.

**VIII. The district court erred in dismissing the failure to engage in the interactive process claim.**

Adams' arguments are the same as those for the failure to accommodate claim in VII above.

**IX. The district court abused its discretion when it denied Adams' motion to file a surreply to Defendant's motion for summary judgment.**

In Adams' motion for leave of court to file her surreply, she pointed out that in Defendant's reply brief the Defendant raised the new argument that Adams did not plead FMLA retaliation. ROA.2631, 2710-2715. Adams did plead that "61. Lakeview violated the Family and Medical Leave Act when it fired Adams when she was on intermittent FMLA leave." ROA.2713. The district court relied on this new argument in making his decision. The district court accepted Defendant's argument that this claim was not plead, which was first brought up in Defendant's reply brief. Without allowing a response from Adams, the district court disregarded Adams' FMLA retaliation claim. ROA 2943, footnote 1.

In *RedHawk Holdings Corp. v. Schreiber Tr. ex rel. Schreiber Living Tr.*, 836 F. App'x 232, 235 (5th Cir. 2020) (per curiam) this Court held that "a district court abuses its discretion when it denies a party the opportunity to file a surreply in response to a reply brief that raised new arguments and then relies solely on those new arguments it its decision." *Butler v. Porter*, 999 F.3d 287, 298 n.6 (5th Cir. 2021)

The district court accepted Defendant's argument that this claim was not plead, without allowing Adams' surreply that set out specifically where in the complaint it was plead. Then the district court based its ruling on FMLA retaliation solely on Defendant's arguments without allowing Adams' arguments that are in the surreply to be filed into the record.

Regarding the Sedgwick documents that Adams subpoenaed, many months before the documents were subpoenaed, Adams requested a production of all emails sent to Shemroske and sent by Shemroske that were about Adams. Request for Production No.7. The letter of March 5, 2022, indicated that Defendant was deficient in its production, including emails regarding FMLA. ROA.344. As indicated on one of the few emails from Sedgwick to Shemroske that was produced by Defendant, all the records of Adams' intermittent FMLA leave were emailed from Sedgwick to Shemroske on the day the FMLA leave was taken. On each email, it states, "You are receiving this notice because you are the supervisor on record of the above listed employee." ROA.815. All the subpoenaed documents were sent from Sedgwick to Shemroske. Sedgwick works for Defendant. It is curious that a subpoena was even necessary.

Adams did subpoena these records and Sedgwick was several weeks late in responding to the subpoena. Adams' counsel was out of the country when the documents arrived at his office. Adams' counsel noticed that a copy of the subpoena

had not been sent to Lakeview and then sent a copy of the subpoena. Before Sedgwick was re-served, the original subpoena was answered and the documents arrived late at Adams' counsel's office. The person who signed for the documents does not work for Adams' counsel, and that person did not communicate with anyone about the arrival of the documents, which sat on Adams' counsel's desk until he arrived from out of the country. The Magistrate was not involved. Adams's counsel first saw the documents the day before the opposition to summary judgment was due.

Adams requests that this Court find the district court abused its discretion in denying the motion for leave to file the surreply.

**CONCLUSION**

Adams has presented sufficient evidence to have the motion for summary judgment reversed for the FMLA claims and the ADA discrimination claim. The FMLA interference claims have substantial evidence of the interference as well as the prejudice that Adams has suffered. In the ADA claim "Team Lead A" is a comparator and Adams survives summary judgment by showing that discrimination is one of the motivating factors of the decision to terminate Adams. Also, Adams should be able to bring her claims of failure to accommodate and failure to enter into the interactive process. She did present evidence to the EEOC of these two claims and a reasonable investigation of the EEOC charge particulars would include

investigation and conciliation of the failure to accommodate and failure to engage in the interactive process claims. Finally, the district court erred in denying the surreply and that is another reason to reverse and remand for trial.

SUBMITTED BY:

_s/Victor R. Farrugia_ Victor R. Farrugia
State Bar No. 19324
vfarrugia@farrugialawfirm.com
Farrugia Law Firm, LLC
1340 Poydras Street
Suite 2100
New Orleans, LA 70112
(504)525-0250 (office)
(504)2930651 (facsimile)

## CERTIFICATE OF SERVICE

I, Victor R. Farrugia, certify that today, September 27, 2022, the foregoing Brief of Appellant has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on all registered counsel of record, and has been transmitted to the Clerk of Court.

_/s/ Victor R. Farrugia_
Victor R. Farrugia

## CERTIFICATE OF COMPLIANCE

1. Undersigned counsel certifies that this brief complies with the typevolume limitations of Fed. R. App. P. 32(a)(7)(B) because:

• This brief contains 12,557 words.

2. This motion also complies with the typeface requirements of Fed.R. App. P. 32(a)(5) and the type requirements of Fed. R. App. P. 32(a)(6) because:

• this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2022 with a 14-point font named Times New Roman.

*/s/ Victor R. Farrugia*
Victor R. Farrugia
Counsel for Virginia D. Adams

Dated: September 27, 2022
