**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

**CASE NO. 22-30389**

**VIRGINIA M. ADAMS,**

**Plaintiff/Appellant,**

**VERSUS**

**COLUMBIA/HCA OF NEW ORLEANS, INCORPORATED,
INCORRECTLY IDENTIFIED BY PLAINTIFF AS LAKEVIEW
REGIONAL MEDICAL CENTER, LLC, DOING BUSINESS AS
LAKEVIEW REGIONAL MEDICAL CENTER**

**Defendant/Appellee.**

_____

**On Appeal from the United States District Court
For the Eastern District of Louisiana
Case No. 20-3030, Honorable Carl J. Barbier, Judge Presiding**
_____

**ORIGINAL BRIEF OF APPELLEE, COLUMBIA/HCA OF NEW
ORLEANS, INC. D/B/A LAKEVIEW REGIONAL MEDICAL CENTER, A
CAMPUS OF TULANE MEDICAL CENTER**

Leslie W. Ehret (La. Bar No. 18494)
Anna K. Potter (La. Bar No. 38376)
**FRILOT L.L.C.**
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8023
Facsimile: (504) 599-8263
lehret@frilot.com
apotter@frilot.com
*Counsel for Defendant/Appellee,
Columbia/HCA of New Orleans, Inc. d/b/a
Lakeview Regional Medical Center,
A Campus of Tulane Medical Center*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities described in Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. Virginia M. Adams, *Plaintiff/Appellant*;

2. Victor R. Farrugia, *Counsel for Plaintiff/Appellant*;

3. Columbia/HCA of New Orleans, Inc. d/b/a Lakeview Regional Medical Center, A Campus of Tulane Medical Center, *Defendant/Appellee*;

4. Leslie W. Ehret, Frilot L.L.C., *Counsel for Defendant/Appellee*;

5. Anna K. Potter, Frilot L.L.C., *Counsel for Defendant/Appellee*.

<div style="margin-left:40%">

Respectfully submitted:

*/s/ Leslie W. Ehret*_____
Leslie W. Ehret (La. Bar No. 18494)
Anna K. Potter (La. Bar No. 38376)
**FRILOT L.L.C.**
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8023
Facsimile: (504) 599-8263
lehret@frilot.com
apotter@frilot.com
*Counsel for Defendant/Appellee,*
*Columbia/HCA of New Orleans, Inc. d/b/a*
*Lakeview Regional Medical Center,*
*A Campus of Tulane Medical Center*

</div>

i

## STATEMENT REGARDING ORAL ARGUMENT

Appellee, Columbia/HCA of New Orleans, Inc. d/b/a Lakeview Regional Medical Center, A Campus of Tulane Medical Center ("Lakeview"), respectfully suggests that oral argument is not necessary for this Honorable Court to decide that the District Court properly reviewed and disposed of all claims. Therefore, Lakeview does not request oral argument on this appeal.

## <u>TABLE OF CONTENTS</u>

**CERTIFICATE OF INTERESTED PERSONS**.......................................................i

**STATEMENT REGARDING ORAL ARGUMENT**...........................................ii

**TABLE OF CONTENTS**.......................................................................................iii

**TABLE OF AUTHORITIES**.............................................................................iv

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**.........................1

**STATEMENT OF THE CASE**.............................................................................1

**I.    FACTUAL BACKGROUND**.........................................................................1

**II.    PROCEDURAL BACKGROUND**...............................................................9

**SUMMARY OF THE ARGUMENT**..................................................................14

**ARGUMENT**........................................................................................................17

**I.    STANDARDS OF REVIEW**.......................................................................17

**II.    FMLA INTERFERENCE**...........................................................................17

    1. Legal Standard.................................................................................17
    2. Lakeview Honored All of Adams' FMLA Leave Requests.............18
    3. The Statements Attributed to Shemroske Do Not Demonstrate Interference With Adams' Rights Under FMLA...............................................23
    4. FMLA Leave Calculated in 15-Minute Increments.......................28
    5. Written Notice of Lakeview's PTO Policy.....................................29
    6. Adams Attempts to Impermissibly Boot-Strap a Claim for FMLA Retaliation to her Complaint...............................................................31

**III.    ADA DISCRIMINATION**...................................................................34

    1. The District Court is Correct: Lakeview Proffered a Legitimate, Non-Discriminatory Reason for Adams' Termination...........................................38
    2. Adams Failed to Demonstrate Lakeview's Legitimate, Non-Discriminatory Reason for Termination Was Pretextual.......................................................40
    3. Adams Did Not and Could Not Identify Any Similarly-Situated Employees Because of Her Unique, Complex Disciplinary History................................44

**IV.    FAILURE TO ACCOMMODATE/ ENGAGE IN THE INTERACTIVE PROCESS**......46

**V.    THE DISTRICT COURT PROPERLY DENIED ADAMS' MOTION TO FILE A SUR-REPLY**................................................................................................51

**CONCLUSION**...............................................................................53

**CERTIFICATE OF SERVICE**............................................................54

**CERTIFICATE OF COMPLIANCE**.....................................................55

# TABLE OF AUTHORITIES

**Cases**

*Boyd v. Corr. Corp. of Am.*,
  616 F. App'x 717, 720–721 (5th Cir. 2015)........................................40
*Acker v. Gen. Motors, L.L.C.*,
  853 F.3d 784, 790 (5th Cir. 2017) ........................................ 21, 23, 25
*Amedee v. Shell Chem. LP-Geismer Plant*,
  384 F. Supp. 3d 613, 624 (M.D. La. 2019) ................................. 12, 34
*Amedee v. Shell Chem., L.P.*,
  953 F.3d 831 (5th Cir. 2020) ...................................................12
*Ashcroft v. Iqbal*,
  556 U.S. 662, 698–99, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ....................12
*Bocalbos v. Nat'l W. Life Ins. Co.*,
  162 F.3d 379, 383 (5th Cir. 1998)...............................................24
*Boudreaux v. Swift Transp. Co.*,
  402 F.3d 536, 540 (5th Cir. 2005) ...............................................17
*Bouie v. Equistar Chems. LP*,
  188 F. App'x 233, 237 (5th Cir. 2006).............................................45
*Byrd v. Clay Cty., Texas*,
  No. 7:21-CV-00027, 2022 WL 3154816, at *3 (N.D. Tex. July 12, 2022).........31
*Capps v. Mondelēz Global LLC*,
  147 F. Supp. 3d 327, 340–41 (E.D. Penn. 2015) ................................50
*Criner v. Texas-New Mexico Power Co.*,
  470 F. App'x 364, 369 (5th Cir. 2012)..........................................34
*Cutrera v. Bd. of Supervisors of La. State Univ.*,
  429 F.3d 108, 113 (5th Cir. 2005) ........................................ 12, 34
*De Franceschi v. BAC Home Loans Servicing*,
  477 F. App'x 200, 204 (5th Cir. 2012)....................................... 12, 34
*De La Garza-Crooks v. AT&T*,
  252 F.3d 436, at *1 (5th Cir. 2001) (citation omitted)................................ 23, 27
*Dodge v. Hertz Corp.*,
  124 F. App'x 242, 244 (5th Cir. 2005)..........................................45
*EEOC v. Chevron Phillips Chem. Co.*,
  570 F.3d 606 (5th Cir. 2009) ..................................................47
*EEOC v. LHC Grp., Inc.*,
  773 F.3d at 701–02 ........................................................ 40, 43, 46
*Elsayed v. Univ. of Houston*,
  2012 WL 2870699, at*3 (S.D. Tex. July 11, 2012) ..........................................27

*Embry v. Hibbard Inshore, L.L.C.*,
    803 F. App'x 746 (5th Cir. 2020) ........................................................17
*FDIC v. Mijalis*,
    15 F.3d 1314, 1327 (5th Cir. 1994) ....................................................36
*Ford-Evans v. United Space All. LLC*,
    329 F. App'x 519, 523 (5th Cir. 2009) ................................................24
*Haley v. Alliance Compressor LLC*,
    391 F.3d 644, 649 (5th Cir. 2004) ......................................................24
*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191, 205 (5th Cir. 2007) ......................................................17
*Jackson v. Hiller Companies, Inc.*,
    No. 19-12175, 2021 WL 5113162, at *5 (E.D. La. Nov. 3, 2021) .............. 12, 51
*Jennings v. Towers Watson*,
    11 F.4th 335 (5th Cir. 2021) ..............................................................47
*Keelan v. Majesco Software, Inc.*,
    407 F.3d 332, 340 (5th Cir. 2005) ......................................................35
*Lanier v. Univ. of Texas Sw. Med. Ctr.*,
    527 F. App'x 312, 316 (5th Cir. 2013) ................................................17
*Laxton v. Gap, Inc.*,
    333 F.3d 572, 578 (5th Cir. 2003) ......................................................40
*Lee v. Kansas City S. Ry. Co.*,
    574 F.3d 253, 260 (5th Cir. 2009) .................................................. 44, 45
*Mauder v. Metro. Transit Authority of Harris Cty.*,
    446 F.3d 574, 580 (5th Cir. 2006) ......................................................24
*Miller v. Metrocare Servs.*,
    809 F.3d 827, 832 (5th Cir. 2016) ......................................................33
*N.Y. Life Ins. Co. v. Brown*,
    84 F.3d 137, 142 n. 4 (5th Cir. 1996) ..................................................36
*Nasti v. CIBA Specialty Chemicals Corp.*,
    492 F.3d 589 (5th Cir. 2007) ..............................................................35
*Pacheco v. Mineta*,
    448 F.3d 783, 789 (5th Cir. 2006) ......................................................48
*Park v. Direct Energy GP, L.L.C.*,
    832 F. App'x 288, 293 (5th Cir. 2020) ................................ 17, 29, 32, 38
*Patton v. Jacobs Engineering Group Incorporated*
    874 F.3d 437 (5th Cir. 2017) ..............................................................47
*Price v. Marathon Cheese Corp.*,
    119 F.3d 330, 337 (5th Cir. 1997) ......................................................43
*Rachid v. Jack In The Box, Inc.*,
    376 F.3d 305, 312 (5th Cir. 2004) ......................................................37

*Ragas v. Tenn. Gas Pipeline Co*.,
  136 F.3d 455, 458 (5th Cir. 1998) ....................................................35

*Ragsdale v. Wolverine World Wide, Inc.*,
  535 U.S. 81, 89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002) ......................... 18, 29

*Ray v. United Parcel Serv.*,
  587 F. App'x 182 (5th Cir. 2014) ....................................................36

*Rutt v. City of Reading*,
  No. 13–4559, 2014 WL 5390428, at *4 (E.D. Pa. Oct. 22, 2014) ......................50

*S.W.S. Erectors, Inc. v. Infax, Inc.*,
  72 F.3d 489, 495 (5th Cir. 1996) ....................................................38

*Sandstad v. CB Richard Ellis, Inc.*,
   309 F.3d 893, 899 (5th Cir. 2002) ...................................................40

*Scoggins v. Chi St. Luke's Health-Brazosport*,
   No. CV H-19-2709, 2021 WL 2420170, at *3 (S.D. Tex. May 12, 2021) .........43

*Spindle v. CKJ Trucking,*
  *LP*, No. 4:18-CV-818, 2020 WL 1283519, at *2 (E.D. Tex. Mar. 18, 2020)......50

*State Indus. Prods. Corp. v. Beta Tech., Inc.*,
  575 F.3d 450, 456 (5th Cir. 2009) ...................................................29

*Stratis Constr., Inc. v. City of Hammond*,
  2020 WL 4000844 (E.D. La. July 15, 2020) ........................................47

*Tatum v. S. Co. Servs.*,
  930 F.3d 709, 713 (5th Cir. 2019) ...................................................18

*Trotter v. BPB Am., Inc.*,
  106 F. App'x 272, 276–77 (5th Cir. 2004) ........................................45

*Twigg v. Hawker Beechcraft Corp.*,
   659 F.3d 987, 1008–09 (10th Cir. 2011) ...........................................22

*Windhauser v. Bd. of Supervisors for La. State Univ. & Agric. & Mech. Coll.*,
  360 F. App'x 562, 565 (5th Cir. 2010) ...............................................47

## Statutes

29 U.S.C. § 2612(a)(1)(D) ................................................................50
42 U.S.C. § 12111(8) ......................................................................50

## Rules

29 C.F.R. § 825.207(a) ...................................................................30
29 C.F.R. § 825.303(c) ...................................................................21
29 C.F.R. § 825.307(a) ............................................................... 26, 27

vii

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the District Court properly granted Lakeview's motion for summary judgment, dismissing with prejudice Adams' only remaining claims against Lakeview: ADA discrimination and FMLA interference.

2. Whether the District Court properly granted Lakeview's Rule 12(b)(6) motion dismissing, with prejudice, Adams' failure to accommodate and interactive process claims because she did not exhaust administrative remedies with respect to these claims.

3. Whether the District Court properly used its discretion to deny Adams' very belated motion for leave to file a sur-reply to Lakeview's motion for summary judgment.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

Appellant, Virginia Adams ("Adams"), former Laboratory Lead for Lakeview Regional Medical Center ("Lakeview"), Appellee, was terminated because she violated the hospital's Substance Use in the Workplace Policy. The policy required she notify her supervisor of any prescribed or over-the-counter medications that might impair her ability to perform her duties. While Adams understood her position required alertness, precision, and concentration, she was admittedly incapable of focusing and performing her duties in the lab because she had taken 300 mg (12

1

tablets) of Benadryl on the day in question. Despite her impaired state, Adams did not notify her supervisor, Laboratory Director Janelle Shemroske ("Shemroske"), until approximately 4.5 hours into her shift. ROA.1337. Only at that time did Adams say she felt uncomfortable performing blood testing because she had taken the significant amount of Benadryl. Notwithstanding Adams' concession this level of impairment was a "safety issue," Adams is claiming her termination – after two Final Written Warnings (one for patient safety and performance and the other for conduct/behavior) and this egregious policy violation – was discriminatory against her under the Americans with Disabilities Act ("ADA"). The District Court correctly disagreed with her.

Adams also claims Lakeview interfered with her Family and Medical Leave Act ("FMLA") rights but, as the District Court correctly found, her rights were not violated. Indeed, Adams was certified for and liberally used FMLA from her initial date of certification, October 24, 2018, through her date of termination, August 9, 2019. Despite sweeping and unsupported statements in her brief, Adams cannot point to a single instance of FMLA being denied or violated.

Adams began working at Lakeview in the position of Laboratory Lead on January 15, 2018. ROA.3245. Shemroske, Adams' supervisor from a previous stint of Lakeview employment, hired Adams for this position. ROA.3252, ROA.1162–72. According to Adams, Shemroske reached out to Adams to encourage her to apply

for the position and made the decision to hire her. *Id.* Also according to Adams, Shemroske was aware of Adams' disability when she made the decision to hire Adams. ROA.3248–50.

In late January 2018, after completing the requisite orientation, Adams' regular shifts started between 9:00–9:15 a.m., until March 2, 2018, when her start time was pushed back to 10:30 a.m. ROA.1281. This was the first of multiple scheduling changes Lakeview made to accommodate Adams and attempt to ameliorate her chronic tardiness. ROA.1281, 1295–96.

As early as her 90-day evaluation in April 2018, although Adams' assigned start time was 10:30 a.m., her actual punches varied, necessitating a discussion of her start time. ROA.1281. Indeed, from March 2018 through August 2018, Adams was late to work beyond the 7-minute grace period 11 times in March, 17 times in April, 21 times in May, 15 times in June, 14 times in July, and 19 times in August. ROA.1322–38. Adams' time records further reflect, that in or around late August/ early September, Adams' start time was pushed back from 10:30 a.m. to 11:00 a.m. – again to assist her in getting to work on time. ROA.1296. Under this new start time, Adams was tardy 11 times in September. ROA.1297. All of these instances of tardiness predated Adams' entitlement to FMLA (Adams' entitlement and certification was not effective until October 24, 2018). ROA.1273–74.

On October 9, 2018, Shemroske met with Adams to implement a Performance Improvement Plan ("PIP"), at which point, Shemroske agreed to zero out any attendance points Adams had previously accrued. ROA.1299–1306, ROA.1339–42. One of the goals noted in the PIP was for Adams to expedite her application to Time Away From Work ("TAFW"), the hospital's third-party leave administrator, so time missed associated with her illness could be potentially covered by FMLA. ROA.1340.

On October 22, 2018, Adams made an error while working in the Blood Bank, for which she was counseled. ROA.1222–42. On October 31, 2018, Adams' progress on the goals outlined in her PIP was reviewed. ROA.1341–42. Additional goals, along with current concerning behaviors observed by Shemroske, were for Adams to (1) have appropriate verbal communication with her coworkers to facilitate efficient workflow and (2) keep her commitments to customers and her peers. ROA.1341–42. As is evidenced by her PIP, Adams' expected improvements extended beyond attendance and were aptly centered on her communication/ commitment to co-workers. ROA.1341–42. Also, despite being given a fresh start on attendance, by November 2, 2018, Adams had accrued 5 new attendance points— not associated with FMLA leave. ROA.1341–42. In fact, all but the last three dates preceded Adams' FMLA certification. And, Adams submitted no reports to TAFW

for October 26, 29, and 30. ROA.1341–42. Accordingly, Adams was issued a verbal warning for attendance, per Lakeview's attendance policy. ROA.1339.

On November 6, 2018[1], Lakeview received notice from TAFW that Adams' request for FMLA intermittent leave had been approved retroactive to October 24, 2018. ROA.1273. Adams' certification allowed for the following frequency and duration: Absences for the Condition: 0 episode(s) per 0 Week(s) with each episode lasting up to 0 Hour(s); Absences for Treatments: 5 episode(s) per 1 Week(s) with each treatment lasting up to 1 Day(s). ROA.1273. From the date of her FMLA approval through termination of her employment, Adams submitted approximately 150 absences for FMLA intermittent leave to TAFW, all of which were approved and honored by Lakeview. ROA.1343–1484.

On November 7, 2018, Adams received a Final Written Warning for conduct/ behavior after she made inappropriate hand gestures (the "bird symbol") in a disrespectful manner to a co-worker. ROA.1246. In Adams' disciplinary documentation, the required corrective action and expectations were: "It is a marked disappointment that this behavior occurred 5 days after a discussion as part of a PIP." ROA.1246. The expectation of behavior to demonstrate accountability as a Team

---

[1] Adams misleadingly states Shemroske received notice from Sedgwick on October 9, 2018, that Adams' intermittent FMLA had been approved. *See* Appellant Brief, p. 15. But that is not the case. Shemroske received an email on October 9 notifying her that Adams *requested* FMLA certification. It was not until November 6, 2018, that Lakeview received notice of Adams' FMLA certification retroactively applying beginning October 24, 2018. *See* ROA.1273.

Lead was clearly stated in this discussion. ROA.1246. Adams was notified, "[f]urther disciplinary action will result in termination." ROA.1246 (emphasis added). Additionally, Adams' PIP progress update was supplemented to include Adams' conduct/ behavior infraction on November 7. ROA.1243–45.

On November 16, 2018, Adams was issued yet another Final Written Warning, this time for performance/ patient safety because she made an error in the blood bank that presented a grave patient safety concern.[2] ROA.1261–62. This was Adams' second Blood bank error within the span of one month, as she had been counseled in October for pulling the wrong blood type unit to crossmatch. *Id.* The required corrective action and expectations going forward stated: "Action plan will be developed to retrain, assess competency in the blood bank department prior to further testing in this area." *Id.* Importantly, at a minimum, this counseling demonstrates blood bank was considered an important function of Adams' position. *Id.*

Due to the serious nature of Adams' November blood bank error, a discussion was held among Adams, Shemroske, Katie Grams-McGovern, Blood Bank Quality Manager ("Grams-McGovern"), and Julie Fast-Winston, Blood Bank Supervisor ("Fast-Winston"). ROA.1252–54. In the meeting, Adams conceded she had made

---

[2] Appellant's argument at page 19 of her brief that the error was not grave because the "error was caught and corrected before it could possibly cause harm to a patient" is absurd. The potential harm was grave; that no patient had to suffer because of it does not change that fact.

the blood bank error and acknowledged it was her responsibility to assure the correct blood type on the unit chosen. *Id.* Adams' own concern about her error demonstrates blood banking was an important function of her position. Shemroske advised Adams at the meeting that the error would be evaluated in conjunction with her current PIP to determine the status of her continued employment. ROA.1253. And, as Shemroske noted, it is a requirement that the Lab Lead position be covered by a generalist Med Tech who can perform blood bank testing. ROA.1252. Nevertheless, Adams chose to remain in her Lead Technician position, despite blood bank work being an essential function of the job. *Id.*

On July 25, 2019, while Adams was on two Final Written Warnings[3]—one for conduct/ behavior and the other performance/ patient safety, the incident that led to her termination occurred. ROA.1259–60. On July 25, Adams presented for work at 11:45 a.m. (ROA.1337) and testified that by that time, she had taken 100mg of Benadryl at 5:00 a.m. and 50mg of Benadryl at 9:00 a.m., a total of 150mg (6 tablets), and she subsequently continued taking an additional 50mg every four hours thereafter. ROA.3308–10.

Around 4:30 p.m., Shemroske asked Adams to work in the blood bank, but Adams refused, stating she did not feel comfortable going into the blood bank

---

[3] Adams was also issued a written warning on January 11, 2019, for attendance; however, that warning was not a factor in her termination. ROA.363.

because she had taken Benadryl—which Adams reported  was, by then, 300mg. ROA.3308–17. Adams was on the clock for approximately 4.5 hours (ROA.1337) before she notified her supervisor she had taken an over-the-counter drug that might (and, according to Adams, did) impair her job performance. After Adams disclosed to Shemroske that she had taken 12 tablets of Benadryl and therefore doubted her own ability to safely perform blood bank work, Shemroske sought advice from HR Vice President, Chris Atkinson ("Atkinson"), on how to handle Adams' inability to safely work in the blood bank due to her significant Benadryl intake. ROA.1503– 05. Shemroske and Atkinson agreed that if Adams could not perform safely in the blood bank (with 300 mg of Benadryl in her system), her ability to work safely in *any lab function* was seriously in doubt. ROA.1503. Accordingly, Adams was sent home. *Id.*; ROA.1337.

Following the events of July 25, 2019, Lakeview conducted an investigation into the issue. ROA.3383–84. As part of its investigation, Atkinson met with Adams, consulted with her supervisor, and obtained statements from other lab employee witnesses. ROA.3383–88, ROA.1506–11. Lakeview's Substance Use in the Workplace Policy was reviewed, and it was confirmed the policy imposed a duty on Adams to report to her supervisor before she started her shift that she had taken an over-the-counter drug that may impair her job performance. ROA.1192–1201.

Accordingly, the investigation supported the conclusion Adams violated Lakeview's Substance Use in the Workplace Policy when she presented for work having admittedly taken a significant amount of Benadryl, before the start of her shift and throughout her shift, felt impaired, but did not notify her supervisor. ROA ROA.3383–88. The amount and frequency of Adams' Benadryl intake that day called into question her ability to safely perform any lab functions. *Id.* Ultimately, Adams' policy violation, together with the fact that she had already been issued two Final Written Warnings for conduct/ behavior and performance/ patient safety merited termination of Adams' employment. ROA.1259–60.

## II.    PROCEDURAL BACKGROUND

On September 20, 2019, Adams filed an EEOC Charge based on disability discrimination. ROA.46–48. In her Charge particulars, Adams alleged she was discriminated against because of a disability *when her employment was terminated on August 9, 2019*, in violation of the Americans with Disabilities Act ("ADA"). ROA.46. To be sure, Adams only identified her termination date as the date on which discrimination occurred. *Id.* On March 6, 2020, Lakeview submitted its Position Statement, addressing the single disability discrimination allegation Adams stated in her Charge. ROA.233–34. On August 10, 2020, the EEOC issued a "no cause" determination and Notice of Right to Sue. ROA.235–37.

On November 7, 2020, Adams filed her Complaint against Lakeview in the United States District Court for the Eastern District of Louisiana. ROA.2, 13–24. In her Complaint, Adams alleged Lakeview discriminated against her when it terminated her employment because of her disability, failed to engage in an interactive process to provide a reasonable accommodation for Adams' disability, failed to provide a reasonable accommodation for her disability, and interfered with her rights under the Family and Medical Leave Act ("FMLA"). *Id.*

On December 28, 2020, Lakeview filed a Rule 12(b)(6) motion to dismiss Adams' failure to accommodate and interactive process claims because Adams failed to exhaust the prerequisite administrative remedies before filing suit. ROA.3, 35–49.

Adams opposed Lakeview's motion to dismiss and in so doing suggested "upon information and belief" the existence of an unknown and unproduced intake questionnaire allegedly containing information about her failure to accommodate claims. ROA.54–60. Lakeview subsequently filed its reply memorandum in further support of its motion to dismiss, *see* ROA.3, 75–84, and the District Court granted Lakeview's motion, ROA.3, 58–91.

Shortly thereafter, Adams filed a motion for reconsideration, based on the existence of the intake questionnaire she eventually obtained through a Freedom of Information Act request. ROA.3, 92–117. The Court granted Adams' motion for

reconsideration, and in its Order, invited Lakeview to file a renewed motion to dismiss. ROA.4, ROA.176–79.

On March 15, 2021, Lakeview filed its renewed motion to dismiss Adams' failure to accommodate and interactive process claims, which the Court *again* granted, dismissing those claims with prejudice. ROA.4, ROA.180–239, ROA.271–78. The Court found Adams failed to exhaust her failure to accommodate and interactive process claims, as Lakeview had no notice via the complaints in her EEOC charge, or her belatedly-raised intake questionnaire. ROA.4, 271–78.

After extensive discovery was conducted, on April 5, 2022, Lakeview filed its motion for summary judgment, seeking dismissal of Adams' only remaining claims: ADA discrimination based on her discharge and FMLA interference. ROA.7–8, ROA.1108–1161. On April 29, 2022, Adams filed her opposition, in which she raised for the first time a claim for FMLA retaliation. ROA.10, ROA.2238–60. On May 5, 2022, after obtaining a one-day extension, Lakeview filed its reply brief in which, among other arguments, it addressed Adams' newly-raised retaliation claim. ROA.10–11, ROA.2648–62. On May 20, 2022—more than two weeks after the summary judgment submission date of May 4, 2022—Adams moved to file a sur-reply, which the District Court understandably denied. ROA.2937.

On June 3, 2022, the District Court granted Lakeview's motion for summary judgment and dismissed with prejudice all of Adams' remaining claims. ROA.2939–

54. In its decision, the Court specifically found Adams' opposition to Lakeview's motion for summary judgment was her first time raising an FMLA retaliation claim. The Court explained, "It is well-settled law in the Fifth Circuit that 'a plaintiff may not rely on new claims raised for the first time in an opposition to a motion for summary judgment.'" *Jackson v. Hiller Companies, Inc.*, No. 19-12175, 2021 WL 5113162, at *5 (E.D. La. Nov. 3, 2021); *see also Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint, but, rather, is raised only in response to a motion for summary judgment is not properly before the court."); *Amedee v. Shell Chem. LP-Geismer Plant*, 384 F. Supp. 3d 613, 624 (M.D. La. 2019), *aff'd sub nom.*, *Amedee v. Shell Chem., L.P.*, 953 F.3d 831 (5th Cir. 2020) (denying consideration of any facts, offered exhibits, or arguments pertaining to plaintiff's newly-raised claim because she failed to plead such a claim in the complaint); *De Franceschi v. BAC Home Loans Servicing*, 477 F. App'x 200, 204 (5th Cir. 2012) ("A properly pleaded complaint must give 'fair notice of what the claim is and the grounds upon which it rests.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 698–99, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). ROA.2943. Regardless, the court ruled it would disregard the argued FMLA retaliation claim both because it had not been raised in Adams' Complaint or thereafter in any amendment and "[e]ven if the Court were to consider this new claim, it would fail as well" because Adams was terminated for "valid

reasons unrelated to any alleged discriminatory or unlawful motive." ROA.2943.

Judgment in favor of Lakeview and dismissing Adams' case was entered that same

day. ROA.2955. On June 25, 2022, Adams filed her notice of appeal. ROA.2956.

# SUMMARY OF THE ARGUMENT

The District Court's orders (1) granting Lakeview's motion for summary judgment and dismissing Adams' ADA discrimination and FMLA interference claims with prejudice; (2) granting Lakeview's Rule 12(b)(6) motion to dismiss Adams' failure to accommodate and interactive process claims; (3) denying Adams' motion for leave to file an untimely sur-reply to Lakeview's motion for summary judgment; and (4) finding Adams did not plead an FMLA retaliation claim and, regardless, any FMLA retaliation claim would fail, should be affirmed for numerous reasons:

- Lakeview honored each and every one of Adams' requests for FMLA intermittent leave – Lakeview never denied Adams any entitlement under the FMLA;

- Adams did and could not show she was prejudiced by any alleged FMLA violation – Adams still had FMLA available to her at the time of her termination;

- Lakeview properly allowed Adams to take FMLA leave in 15-minute increments;

- Adams failed to demonstrate she was prejudiced by any lack of written notice of Lakeview's PTO policy, and in any event, Adams did not raise this allegation in her pleadings or any motion practice;

- Adams impermissibly attempted to insert FMLA retaliation for the first time in her opposition to Lakeview's motion for summary judgment and, regardless, she could not state a claim for FMLA retaliation;

- Adams did not argue at the District Court level a mixed-motive analysis applied to her alleged discriminatory discharge; therefore, it is improper for appeal. Regardless, the District Court considered pretext and mixed-motive case law to determine Adams' discriminatory discharge claim, which was properly dismissed;

- Lakeview proffered a legitimate, non-discriminatory (and lawful) reason for Adams' termination;

- Adams failed to demonstrate Lakeview's legitimate, non-discriminatory reason for termination was pretextual, and she has provided no legitimate argument supporting mixed-motive (even if a mixed-motive analysis could be considered on appeal);

- Adams could not identify any similarly-situated employees because of her unique, complex disciplinary history, and regardless, no similarly-situated employees were treated better in like circumstances;

- Adams failed to exhaust her failure to accommodate and interactive process claims; and,

- The Court did not abuse its discretion in denying Adams' motion to file a sur-reply seeking to further brief her belatedly-raised FMLA retaliation claim.

## ARGUMENT

### I. STANDARDS OF REVIEW

An order granting summary judgment is reviewed *de novo*. *Boudreaux v. Swift Transp. Co*., 402 F.3d 536, 540 (5th Cir. 2005). An order on a Rule 12(b)(6) motion to dismiss is reviewed *de novo*. *In re Katrina Canal Breaches Litig*., 495 F.3d 191, 205 (5th Cir. 2007). An order denying a motion to file a sur-reply is reviewed for an abuse of discretion. *See Embry v. Hibbard Inshore, L.L.C.*, 803 F. App'x 746 (5th Cir. 2020).

### II. FMLA INTERFERENCE

#### 1. Legal Standard

The District Court properly articulated that in order to establish a *prima facie* interference case, Adams must have shown that (1) she was an eligible employee; (2) Lakeview was subject to the FMLA's requirements; (3) Adams was entitled to FMLA leave; (4) she notified Lakeview of her intention to take FMLA leave; and (5) Lakeview denied her the benefits to which she was entitled under the FMLA. *Lanier v. Univ. of Texas Sw. Med. Ctr.,* 527 F. App'x 312, 316 (5th Cir. 2013). The District Court found, "the dispute arises under the fifth element: whether Lakeview denied Adams her FMLA benefits to which she was entitled." ROA.2951. In addition, Fifth Circuit precedent unequivocally requires Adams to have shown she was prejudiced as a result of FMLA interference. *See, e.g.*, *Park v. Direct Energy*

*GP, L.L.C.*, 832 F. App'x 288, 293 (5th Cir. 2020) (citing *Tatum v. S. Co. Servs.*, 930 F.3d 709, 713 (5th Cir. 2019)) (including plaintiff's required showing of prejudice as a result of the alleged interference, as a sixth element to make a prima facie case of FMLA interference); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002) (requiring a showing of prejudice to prevail on a FMLA interference claim).

**2.  Lakeview Honored All of Adams' FMLA Leave Requests.**

The crux of Adams' FMLA interference argument on appeal is: "Lakeview interfered with Adams' FMLA rights by denying her the right to use FMLA leave for tardy occurrences caused by her serious health condition." Appellant Brief, p. 26. Fatally, however, Adams failed to identify any date on which Lakeview denied her right to use FMLA leave – whether for tardy occurrences or otherwise.

As an initial matter, despite Adams' representation that her FMLA intermittent leave was approved on October 9, 2018, it was not.[4] Appellant Brief, p. 15. Lakeview has consistently clarified, and the November 6, 2018, Approval of Intermittent Leave Letter confirms in no uncertain terms—Adams *requested* intermittent leave on October 9, 2018, and after the Time Away From Work Service Center reviewed that request, she was retroactively approved for leave for the period

---

[4] Adams cites to ROA.2434, 2433, to support this statement, but that citation is Adams' *request* for leave on October 9, 2018—not her approval.

of October 24, 2018, through April 23, 2019. ROA.1273. Indeed, Adams'
representation that "Shemroske received notice from Sedgwick on October 9, 2018,
that Adams' intermittent FMLA leave was approved" is bald untruth. Appellant
Brief, p. 15. As the record reveals, on October 9, 2018, Shemroske actually received
a letter from TAFW ***denying*** Adams request for FMLA leave. ROA.2431. The
TAFW letter *approving* Adams' requested leave was not received until November
6, 2018. ROA.1273.

In support of her specious interference claim, Adams first cites two PIPs,
containing dates on which she was tardy, as evidence of FMLA interference.[5]
Appellant Brief, p. 31. One of the PIPs is dated October 9, 2018, making it *ipso facto*
irrelevant to Adams' FMLA interference claim because that first PIP pre-dates
Adams' certification for FMLA intermittent leave. *Compare* ROA.1340 *with*
ROA.1273. The October 9 PIP included a list of goals and action plan items with
dates to review progress for which Shemroske would provide updates. ROA.1340.
One of the goals listed expressly states, "Expedite application to TAW to determine
eligibility for use of FMLA for blocks of time missed from work." *Id.* This
necessarily indicates that by October 9, Adams had not yet been approved for FMLA

---

[5] On page 19 of her brief (not in the Argument section), Adams mentions the written disciplinary
action for attendance she received on January 11, 2019 (assuming the 2018 date Adams notes is a
typographical error), as contemplating six attendance points for tardy occurrences during "a period
that Shemroske would not let Adams use her FMLA leave for tardy occurrences, as stated on
Shemroske's latest PIP." Appellant Brief, p. 19 (citing ROA.363, 2460). This statement is a gross
mischaracterization of the record, as will be further discussed *infra*.

intermittent leave, as she was still in the process of applying for it. As previously stated, on October 9, 2018, Lakeview received notification from TAFW that Adams' request for FMLA leave had been **denied**. ROA.2431. Adams ignores this context, and instead asserts the statement on the PIP that follows "FMLA not to be applied to Tardy occurances [sic]" amounts to interference. Appellant Brief, pp. 16, 19, 32. This premise is fatally-flawed for two reasons: (1) by October 9 when this PIP was first issued, FMLA *could not* be applied to Adams' tardies because she had not yet been certified for leave, and (2) after her intermittent leave was approved, Adams took and was granted leave to cover each and every absence for which she submitted an LOA report. Tellingly, Adams has cited no record evidence to contradict this.

On October 31, 2018, Shemroske updated the PIP to reflect the five (5) attendance points Adams accrued since Shemroske zeroed them out on October 9.[6] ROA.1341–42. And, in keeping with the PIP Action Plan, as well as Lakeview's Attendance and Tardiness Policy, Adams was given a verbal warning for attendance, as she had accrued more than four points for her attendance infractions.[7] *See*

---

[6] The dates listed as tardy occurrences are as follows: October 12, 15, 16, 18, 22, 26, 29, 30 (plus one call-in). ROA.1342. Shemroske also updated Adams' PIP to include goals for Adams to be more accountable to her co-workers in her role as Team Lead, and further noted Adams' current behaviors as contributing to a negative impact of employee satisfaction and morale. ROA.1341–42.

[7] Adams cites her declaration submitted in opposition to summary judgment stating she was "surprised by [the November 2 verbal warning for attendance] because she had been approved for FMLA leave in early October." Appellant Brief, p. 17 (citing ROA.2265). But the record negates her unsupported assertion she was approved for FMLA leave in early October. *Compare* ROA.1273 *with* ROA.2431. And that Adams was "surprised" by getting a verbal warning after

ROA.1341; ROA.1485–1488; ROA.1339. Recall, this PIP update and verbal warning for attendance, signed by both Shemroske and Adams by November 2 at the latest, still pre-date the November 6 letter from TAFW, approving Adams' intermittent leave and putting Lakeview on notice of her approved leave. *Compare* ROA.1339 *and* ROA.1341–42 *with* ROA.1273. It is axiomatic that up until November 6, before Lakeview had been notified of Adams' approved leave (and after it had previously been notified of Adams' denied leave, *see* ROA.2431), it could not have marked Adams' absences from work as anything other than what they were—tardy occurrences. Accordingly, the November 2 verbal warning for attendance, and associated PIPs updated to that time, are not and cannot constitute an interference with Adams' FMLA rights.

Adams also cites ROA.363, her January 11, 2019, written disciplinary action for attendance, as an instance in which she was prejudiced by Shemroske denying her right to use her FMLA leave for tardy occurrences.[8] By that time, Adams had

---

being perennially tardy on dates for which she—not only had not actually been approved for leave, but also for which she never submitted a LOA request altogether—is disingenuous.

[8] This disciplinary action, though referenced on summary judgment, is not directly cited or included as an exhibit to the briefings by either of the parties. ROA.1108–1636; ROA.2238–2605. Rather Adams' citation on appeal is to the disciplinary action marked as an exhibit in her motion to compel dated March 8, 2022. ROA.363. Nevertheless, this disciplinary action does not support FMLA interference because—as the full context of the rest of the record makes clear—it played no part in Adams' separation, and she was not prejudiced by it. Further, Adams did not request FMLA for these occurrences. ROA.1343–1484. As this Court has confirmed, FMLA regulations "explicitly allow employers to condition FMLA leave on following the employer's policy" for requesting leave. *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 790 (5th Cir. 2017). The Court further held: "Even when an employee's need for leave is unforeseeable, the regulations make clear the employee's duty to comply with the employer's policy." *Id.* at 789; 29 C.F.R. §

accrued a total of six (6) attendance points. ROA.363. All of the tardy occurrences listed that pre-date Adams' retroactively-approved certification date, October 12, 15, 16, 17, 18, 22, are appropriately not covered by FMLA. ROA.363. The dates marked as tardy occurrences following approval of Adams' FMLA, October 26, 29, 30, November 2, and January 8, 9, are likewise appropriate because Adams did not submit a request to TAFW for any of these dates. *Id.*; ROA.1343–1484. Adams could have retroactively applied for leave, as she did many times, with the leave being granted by Lakeview. But she did not.

In fact, there is a date, November 1, listed in Shemroske's progress updates in the October 9 PIP, on which Adams was *initially* marked tardy, but that date was never counted towards her attendance points in later-dated PIPs or any disciplinary action (*compare* ROA.1340 *with* ROA.1342, 1339, 363) because after Adams arrived late for her shift that day, she belatedly submitted a request for FMLA leave to cover that absence. ROA.1347. Thereafter, Lakeview retroactively applied FMLA intermittent leave for the absence, as Adams requested. ROA.1301. As it happens,

---

825.303(c) ("When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances."). As it stands, "an employer generally does not violate the FMLA if it terminates an employee for failing to comply with a policy requiring notice of absences, *even if the absences that the employee failed to report were protected by the FMLA.*" *Acker*, 853 F.3d at 789 (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1008–09 (10th Cir. 2011)) (emphasis in original). Thus, any disciplinary action based on tardy occurrences for which Adams failed to request leave, in keeping with Lakeview's usual and customary requirements, does not constitute interference. *See Acker*, 853 F.3d at 789–90.

the November 1, 2018, tardy occurrence and subsequent FMLA certification demonstrates Adams knew how to get an incidence of tardiness FMLA-certified and removed from her attendance record. And Lakeview honored those requests.

 As is plainly evident, Lakeview never interfered with Adams' rights under the FMLA. Record evidence demonstrates—and Adams cannot dispute—she did <u>not</u> request FMLA leave for any of the absences listed in either her PIPs or disciplinary actions. *Compare* <u>ROA.1339</u>–42 and <u>ROA.363</u> *with* <u>ROA.1343</u>–1484; *see Acker*, <u>853 F.3d at 788</u> (citation omitted) ("Summary judgment cannot be defeated through conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."); *see also De La Garza-Crooks v. AT&T*, <u>252 F.3d 436</u>, at *1 (5th Cir. 2001) (citation omitted) (confirming that a plaintiff suffers no FMLA injury when she receives all the leave she requests).

### 3. <u>The Statements Attributed to Shemroske Do Not Demonstrate Interference With Adams' Rights Under FMLA.</u>

Throughout her brief, Adams alleges statements supposedly made by Shemroske support her claim of FMLA interference. But, they do not:

- "<u>Shemroske called Adams on 10/4/18, on Adams' day off, to tell her that she was out of PTO and could not take a day off.</u>" Appellant Brief, p. 34 (citing <u>ROA.2567</u>).

Adams' "support" for the above statement is a voicemail message she apparently tape-recorded that is incomplete and somewhat incomprehensible. Most

importantly, nowhere in the message does it indicate Adams had a doctor's appointment or that her absence would have been protected under the FMLA. ROA.2567. Even so, Adams was **not** certified for FMLA on October 4, 2018 (ROA.1273), so any statements on October 4 about time off cannot be FMLA interference. *See Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998) ("To make a prima facie case for interference with FMLA rights, a plaintiff must first demonstrate that her leave was protected under the FMLA."); *see also Ford-Evans v. United Space All. LLC*, 329 F. App'x 519, 523 (5th Cir. 2009) (citing *Mauder v. Metro. Transit Authority of Harris Cty.*, 446 F.3d 574, 580 (5th Cir. 2006); *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004)).

- "Shemroske received notice from Sedgwick on October 9, 2018, that Adams' intermittent FMLA leave was approved. She informed Atkinson of that fact and he replied that even though FMLA was approved he still wanted Shemroske to have a conversation with Adams about timely reporting to work." Appellant Brief, p. 15 (citing ROA.2434, 2433).

Again, Adams' contention Shemroske received notice on October 9, 2018, that Adams' intermittent FMLA was approved is simply wrong and not supported by record evidence. ROA.1273, ROA.2431. This email exchange does not show any interference with Adams' FMLA rights; instead, it indicates Lakeview granted Adams' requested, leave for her October 9 absence from work. ROA.1300. That

Adams was granted *more* leave than that for which she was approved certainly does not constitute interference with her rights under the FMLA.

- "Shemroske told Adams her illness related tardy occurrences were not covered by FMLA. As a result, Adams did not apply for FMLA leave and Shemroske disciplined Adams for her illness related tardy occurrences." Appellant Brief, p. 20.

Conspicuously unsupported by any citation to the record, Adams' conclusory allegations here amount to nothing more than the type of unsupported, speculative assertions that are not competent summary judgment evidence. *See Acker*, 853 F.3d at 788. Indeed, the Court need only look to the actual evidence in the record, proving Adams applied for FMLA leave, and upon approval, was granted leave on numerous occasions to cover tardy occurrences related to her illness. ROA.1281–1321, ROA.1343–1484.

- "In an email to Atkinson on 6/4/19, Shemroske expresses her concern that excused tardiness by Adams' FMLA leave is too extensive and suggests requesting more information from Dr. Olivier. She also asks if the 0-episode designation means that tardiness is not excused. In this email she states that the majority of Adams' tardy occurrences are for 15-30 minutes." Appellant Brief, p. 32 (citing ROA.1284).

First, this statement misrepresents the email cited. Shemroske is not "express[ing] her concern" in this communication; rather, she is providing a report to HR about Adams' FMLA usage and posing follow-up questions in light of Adams' re-certification for intermittent leave. ROA.1284. Nor does Shemroske characterize Adams' FMLA use as being "too extensive"; she merely notes a "trend of increasing number of days" Adams is 15–30 minutes[9] late for her 11:00 a.m. shift. ROA.1284.

Adams is correct that Shemroske asked HR Vice President Chris Atkinson whether Lakeview could request a clarification from Adams' provider regarding her medical certification because the certification was for zero episodes per week for her condition, but five episodes per week for treatments. *See id.* That is hardly interference with Adams' FMLA rights. Quite the opposite, Shemroske asking Atkinson if it was appropriate to obtain clarification of Adams' medical certification is *categorically compliant* with FMLA regulations. *See* 29 C.F.R. § 825.307(a) (*requiring* an employer seeking clarification/ authentication of a medical certification to "use a health care provider, **a human resources professional**, a leave administrator, or a management official. ***Under no circumstances, however, may***

---

[9] Shemroske's comments that the majority of Adams' late occurrences were for **15** or 30 minutes effectively corroborates that Adams took and was granted intermittent leave in 15-minute increments—once again, negating Adams' baseless claim of FMLA interference for which she cites no record evidence.

*the employee's direct supervisor contact the employee's health care provider*.").

Shemroske properly posed questions to Atkinson, as Shemroske herself was <u>prohibited</u> from seeking that information from Adams' provider directly. *See id.* Contrary to Adams' assertion that Shemroske's email to Atkinson was a way to "restrict" her use of FMLA leave (Appellant Brief, p. 32) it is actually what is <u>demanded</u> of employers under the law. *See* 29 C.F.R. § 825.307(a).

- "Also, on 7/25/19, Shemroske emailed Atkinson that Adams took FMLA leave for the 3 hours and 30 minutes that day for the time Adams missed after Shemroske sent Adams home. She is again questioning Adams' use of her FMLA leave." Appellant Brief, p. 32 (citing ROA.949).

There is nothing about this email, sent after Adams was sent home for the offense that led to her termination, that suggests FMLA interference. All this email shows is Lakeview was aware of the FMLA leave Adams took *after* the terminable offense. [10] Despite the post-hoc request for leave, it was granted anyway. ROA.1478.

Adams was granted all the FMLA leave she requested; she suffered no adverse action or prejudice for taking any amount of FMLA leave; and, Adams has not cited

---

[10] Regardless, Adams fails to demonstrate any such "questioning" comments amounted to being "discouraging" such that they actually caused her to refrain from taking leave. *See Elsayed v. Univ. of Houston*, 2012 WL 2870699, at *3 (S.D. Tex. July 11, 2012) (citing *De La Garza-Crooks v. AT&T*, 252 F.3d 436, at *1 (5th Cir. 2001)) (explaining that even assuming the discouragement from using FMLA leave is sufficient to state an FMLA injury, the plaintiff must plead—and later present evidence—that she actually refrained from taking leave because of the employer's discouragement). In fact, there is no evidence to suggest Adams even had knowledge of this email from Shemroske to Atkinson until it was produced in discovery of this litigation.

to any date on which she refrained from taking leave because of any discouraging statements allegedly made by Shemroske or Atkinson.

### 4. **FMLA Leave Calculated in 15-Minute Increments**

Next, Adams alleges she was forced to use 30-minute intervals for timekeeping of FMLA leave instead of 15-minute intervals. Appellant Brief, p. 33. This allegation too is unaccompanied by any citation to the record. Understandably so, because Adams identifies no dates on which she was forced to take her FMLA leave in 30-minute rather than 15-minute intervals. Adams points to January 15, 2019, February 23, 2019, and February 26, 2019, as dates on which she took FMLA leave for 15 minutes each day (*id.* at 32), and her Punch Detail Report from that time period confirms Adams requested and was granted FMLA leave on those three days for 15 minutes each day—consistent with the timekeeping interval to which Adams avers she is entitled. ROA.761. And actually, Adams' Punch Detail Report reflects that on February 26, 2019, she requested and was granted 15 minutes of FMLA leave for being tardy because of "car trouble." ROA.761. Indeed, Lakeview honored Adams' request for leave to cover her absence even though it was not for her disability. *Id.* Contrary to Adams' allegations of interference, Lakeview was more than generous in honoring Adams' requests to use her intermittent leave for occurrences of tardiness. *See id.*

Further, Adams has not shown she suffered prejudice as a result of Lakeview granting her requests to take FMLA intermittent leave in 15-minute increments. *See Ragsdale*, 535 U.S. at 89, 122 S. Ct. at 152 (requiring a showing of prejudice to prevail on a FMLA interference claim); *see also Park*, 832 F. App'x at 294 (finding no prejudice where plaintiff's request for leave was approved in full). She did not because she cannot. Adams still had FMLA available to her at the time of her termination (ROA.1271), so the alleged over-deduction from her FMLA entitlement is irrelevant. Here, too, Adams fails to state a claim of interference.

### 5.  Written Notice of Lakeview's PTO Policy

Adams raises for the first time on appeal she was not given written notice of Lakeview's requirement that PTO be used concurrently with FMLA. Appellant Brief, pp. 34–35. Given Adams never made this argument at the district court level, it is not ripe for review. *See State Indus. Prods. Corp. v. Beta Tech., Inc.*, 575 F.3d 450, 456 (5th Cir. 2009) ("[A]rguments not raised before the district court are waived and will not be considered on appeal unless the party can demonstrate 'extraordinary circumstances.'"). Nowhere in her summary judgment briefing does Adams allege as part of her FMLA interference claim that Lakeview failed to provide written notice of Lakeview's policy requiring employees' PTO to run concurrently with

their FMLA. ROA. 2238–60. Rather, Adams argued only that the PTO policy *itself*

was impermissible[11]:

> Another interference claim is that [Lakeview] required Adams to use
> up all of his [sic] PTO every time he [sic] used his [sic] FMLA leave.
> This was a problem for Adams because he [sic] could not take off work
> for personal reasons, especially if she needed a special doctor visit.
> Defendant indicates that it can legally have such a policy. But why must
> it do so if it causes harm to the employees who are certified for FMLA
> leave?

ROA.2248.

Adams complains that because Lakeview did not provide written notice of its

(permissible) policy requiring employees concurrently use PTO when taking FMLA

leave, she was prejudiced because "it took away her ability to have an occasional

day off." Appellant Brief, p. 34. For example, Adams claims on October 1, 2018,

she called in with a migraine but had insufficient PTO to stay home. *Id.* However,

as stated above, Adams had not received FMLA certification by this date. So,

Adams' lack of available PTO before her FMLA certification has no bearing on her

FMLA interference claims. Also of no moment is Adams' allegation that on

February 16, 2019, she needed eight hours of FMLA leave to care for her mother,

and she did not have sufficient PTO to cover it. Therefore, after that day off, partially

---

[11] This, of course, is not the case. 29 C.F.R. § 825.207(a) clearly allows employers to require PTO
be used concurrently with FMLA: "If an employee does not choose to substitute accrued paid
leave, the employer may require the employee to substitute accrued paid leave for unpaid FMLA
leave."

covered by PTO and partially unpaid leave, Adams had no remaining PTO. ROA.820, 1315; Appellant Brief, p. 34. Regardless whether Adams expended all of her remaining PTO on that day, or thereafter, Adams continued accruing PTO, and as her punch detail report reflects, just 10 days later, Adams had PTO to use and did so. ROA.1316. Indeed, Adams continued accruing and using PTO up until the termination, as is evidenced by her receipt of a PTO payout of 11.82 hours in her final paycheck. ROA.1271, ROA.1316–1321.

At bottom, Adams has failed to demonstrate Lakeview interfered with her FMLA rights by failing to follow proper notice requirements regarding her leave. Accordingly, her claim of interference due to a lack of proper notice fails. *See Byrd v. Clay Cty.*, 2022 WL 3154816, at *3 (N.D. Tex. July 12, 2022) (holding plaintiff-employee's FMLA interference claim for lack of proper notice failed where she regularly used and complied with the requirements of her leave).

## 6. **Adams Attempts to Impermissibly Boot-Strap a Claim for FMLA Retaliation to her Complaint.**

Adams impermissibly attempted to raise a claim for FMLA retaliation for the first time in her opposition to Lakeview's motion for summary judgment. ROA.2943. Yet, Adams—no stranger to grasping at straws—now avers she sufficiently pleaded a claim of FMLA retaliation, alleging her employment was terminated, in part, in retaliation for using/ attempting to use FMLA leave. Appellant Brief, pp. 35–38.

31

Adams' Complaint belies that assertion. Adams pleaded the following: "Lakeview violated the Family and Medical Leave Act when it fired Adams *when* she was on intermittent FMLA leave" but "unlawfully terminated Adams' employment *because* of her disability." *Compare* <u>ROA.21</u> *with* <u>ROA.20</u> (emphasis added).[12] This linguistic distinction is <u>not without</u> a difference, especially coupled with the fact that Adams' recital of claims decidedly does not include a claim for FMLA retaliation. <u>ROA.18</u>–22.

Adams alleges: (1) Adams was an eligible employee under the Family and Medical Leave Act ("FMLA"), <u>ROA.20</u>, ¶ 53; (2) Lakeview is subject to FMLA requirements, <u>ROA.20</u>, ¶ 54; (3) Adams was entitled to leave under the FLMA [sic], <u>ROA.20</u>, ¶ 55; (4) Adams gave proper notice of her intention to take FMLA leave, <u>ROA.20</u>, ¶ 56; (5) Lakeview denied Adams benefits to which she was entitled under the FMLA, <u>ROA.20</u>, ¶ 57; (6) Adams was prejudiced by Lakeview's denial of her benefits, <u>ROA.21</u>, ¶ 58. These allegations mirror the elements of an FMLA interference claim. *See, e.g.*, *Park*, <u>832 F. App'x at 293</u>.

On the other hand, Adams makes no allegations supportive of a retaliatory discharge claim. To establish a prima facie case of retaliatory discharge, the

---

[12] Indeed, a critical difference between a claim for FMLA interference and FMLA retaliation is intent/ motive. Adams plainly pleaded in her Complaint that Lakeview terminated her employment *because*—meaning with intent/ discriminatory animus—she has a disability; on the other hand, Adams merely alleges that Lakeview terminated her *when*—only temporally proximate to when— she was on FMLA intermittent leave. <u>ROA.20</u>–21.

employee must show that (1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a *causal link* between the protected activity and the discharge.

Unlike Adams' exact recitation of the elements of a claim for FMLA interference, nowhere in her Complaint does Adams allege a causal link between her FMLA use and her discharge. Rather, Adams alleges her employment was unlawfully terminated **because** of her disability. *See* ROA.20.

Even if Adams had properly pleaded a claim for FMLA retaliation (which she did not), the District Court appropriately found on summary judgment that any such retaliation claim would have failed because Lakeview proffered a legitimate, non-discriminatory/ non-retaliatory reason for Adams' termination. *See* ROA.2943 ("Even if the Court were to consider this new claim, it would fail as well. While FMLA retaliation and ADA discrimination 'claims vary in their prima facie elements, [neither] will give rise to any relief where the employer has terminated the employee for valid reasons unrelated to any alleged discriminatory or unlawful motive.' *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016). As discussed more fully below, the Court finds that Lakeview terminated Adams for valid reasons unrelated to any alleged discriminatory or unlawful motive.").

Accordingly, because Adams raised an FMLA retaliation claim for the first time in her opposition to summary judgement, and it was never pleaded, it should be

disregarded. *See Cutrera*, 429 F.3d at 113 ("A claim which is not raised in the complaint, but, rather, is raised only in response to a motion for summary judgment is not properly before the court."); *Amedee*, 384 F. Supp. 3d at 624 (denying consideration of any facts, offered exhibits, or arguments pertaining to plaintiff's newly-raised claim because she failed to plead such a claim in the complaint); *De Franceschi*, 477 F. App'x at 204 ("A properly pleaded complaint must give 'fair notice of what the claim is and the grounds upon which it rests.'").

## III.  ADA DISCRIMINATION

Presumably understanding she failed to surmount Lakeview's legitimate, non-discriminatory reason for her termination, Adams, for the first time, takes a shot at a "mixed motive" argument. First, having never raised "mixed motive" in her Complaint or summary judgment briefing, she has waived this argument on appeal. *Compare* ROA.13–24 *and* ROA.2238–60 *with* Appellant Brief, pp. 38–50.

Similar to the situation here, in *Criner v. Texas-New Mexico Power Co.*, 470 F. App'x 364, 369 (5th Cir. 2012), this Court found the plaintiff's mixed motive argument was waived on appeal because it was not made in her opposition to summary judgment. The district court there, as here, granted summary judgment using a pretext analysis.  This Court explained the waiver as follows:

> [The defendant] did not mention the mixed-motive analysis in its summary judgment filings, and [the plaintiff] did not press the mixed-motive analysis in her response. In fact, the terms "mixed-motive" appeared nowhere in her initial response to [the defendant's] summary judgment motion or in her

supplemental response. This court has previously held that in a mixed-motive case, if "a party wishes to preserve an argument for appeal, the party must press and not merely intimate the argument during the proceedings before the district court." *Keelan v. Majesco Software, Inc*., 407 F.3d 332, 340 (5th Cir. 2005) (internal quotation marks omitted). An argument must be raised to such a degree that the district court has an opportunity to rule on it. Id. The district court need not sift through the record for evidence supporting a party's opposition to summary judgment. *Ragas v. Tenn. Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998). [The plaintiff] did not adequately press a mixed-motive argument before the district court. As such, the district court was correct in applying the pretext analysis to [the plaintiff's] claims because [the plaintiff] waived her mixed-motive theory.

*Id*. at 369.

Next, while Adams paints with a broad brush and says the "district court erred when it did not continue the inquiry after it concluded that Adams failed to demonstrate pretext," – obliquely suggesting a "mixed motive" analysis should apply – she provides no information or evidence supporting Lakeview had a mixed motive in its termination decision. That is, Adams <u>never</u> conceded before the District Court – even for argument's sake – Lakeview had a legitimate nondiscriminatory reason to terminate her. ROA.2248–59. Accordingly she has waived any right to make such an argument now.

Indeed, the Fifth Circuit has unequivocally addressed the issue of waiver of a mixed-motive claim. In *Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589 (5th Cir. 2007), the Court affirmed the district court's holding that the employer's proffered reason for plaintiff's termination was not pretextual. In so holding, the Court noted:

Alternatively, Nasti argues for the first time on appeal that her employer had mixed-motives for terminating her. This court has noted that "no bright-line rule exists for determining whether a matter was raised below." *See N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 142 n. 4 (5th Cir. 1996). Nonetheless, if a "litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court. If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal." *FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994).

Because she failed to present her mixed-motives claim to the district court in the first instance, Nasti has waived it. Nasti's claims that she never falsified a call report conflicts with a mixed-motive theory of recovery, whereby plaintiffs allege that the legitimate nondiscriminatory reason is not the primary reason for termination. Nasti never conceded before the district court, even for argument's sake, that Ciba had a legitimate nondiscriminatory reason to terminate her. Thus, it cannot be said that the district court had the opportunity to rule on her mixed-motive claim.

*Id.* at 595. As in *Nasti*, Adams never conceded before the District Court – even for argument's sake – Lakeview had a legitimate nondiscriminatory reason to terminate her. *See id.*; *see also* ROA.2248–59. Thus, because Adams failed to present to the District Court a mixed-motive theory as to her alleged discriminatory discharge, the Court did not have the opportunity to rule on it, and any such claim has been waived on appeal. *Id.*

Regardless, the District Court was not in error; this Court has upheld judgments wherein the district court considered mixed motive, but did not continue the burden-shifting analysis upon finding no pretext. *See, e.g.*, *Ray v. United Parcel Serv.*, 587 F. App'x 182 (5th Cir. 2014).

That makes sense because under a mixed-motive analysis, the court proceeds through three burden-shifting steps: (1) the employee must make a prima facie case; (2) upon the employee's satisfaction of the first requirement, "the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action"; (3) if the employer makes a sufficient showing, "the employee must offer sufficient evidence to create a genuine issue of fact" that the employer's proffered reason is pretext or, "although true, is but one of the reasons for its conduct, another of which was discrimination." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). The District Court applied that exact same analysis.

Like the District Court here, in *Ray*, the Court, declined to continue the analysis after the employee failed to make a showing of pretext, reasoning that even if it were to proceed with the analysis, the employer had presented sufficient evidence to satisfy its showing that it would have taken the adverse employment actions regardless of the plaintiff's exercising his rights under the FMLA. *Id.* at 196. The same reasoning applies here. The District Court did not have to take the futile step of looking for something more because it found: "Adams failed to produce sufficient evidence from which a jury could conclude that the real reason for her termination was discrimination on account of her disability, not her violation of Lakeview's Substance Use Policy."

1. **The District Court is Correct: Lakeview Proffered a Legitimate, Non-Discriminatory Reason for Adams' Termination**

Adams violated Lakeview's Substance Abuse Policy on July 25, 2019, when she was already on two final written warnings. ROA.1259–60. Per her own admission to Shemroske and Atkinson at the time of the incident, by around 4:30 p.m., she had taken 300mg[13] of Benadryl so far that day.[14] ROA.3308–17. Benadryl, an antihistamine universally-known to cause drowsiness, clearly qualifies as the type of over-the-counter medication Lakeview's Substance Abuse Policy requires employees to disclose to their supervisor at the start of their shift. ROA.1195. Yet, Adams worked for about 4.5 hours of her shift (ROA.1337) before she disclosed to Shemroske the alarming amount of Benadryl she had taken. ROA.3308–17.

Despite Adams' persistent protestations to the contrary, blood bank work is a requirement of the Lead Tech position. ROA.1252. Additionally, record evidence and Adams' own testimony directly contradict her conclusory statements that blood bank work only constitutes 5% of her job duties. ROA. 1202–21; ROA.3300–06.

---

[13] Had Adams been taking Benadryl as scheduled by her doctor, she would not have taken that high a quantity by that time of the day. ROA.3308–17; ROA.3438–40.

[14] In Adams' declaration attached to her opposition to summary judgment, she tried to revise her sworn testimony by alleging 300 mg was the amount of Benadryl she had taken the *entire day* between 5:00 a.m. and 10:00 p.m. *See* ROA.2274. But there is simply no testimony or record evidence to support that assertion. *See Park*, 832 F. App'x at 294 n.1 (5th Cir. 2020) (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("Parties can't defeat summary judgment with affidavits that impeach sworn testimony without explanation.").

Lakeview has clearly established blood bank work *was* an essential function of Adams' job[15] – and Adams knew it.[16] Adams' job description lists 15 position-specific competencies related to working in the blood bank, accounting for more than a quarter (25%) of all the competencies listed for Plaintiff's job.[17] Lakeview made it abundantly clear in assessments, counselings, and corrective/ disciplinary documentation that blood bank work was an essential function of Adams' job.[18] And Adams knew as much; there is even a quote admitting as much in Adams' brief. *See* Appellate Brief, p. 42 (quoting ROA.2562). Adams concedes she said in her termination meeting: "So because I said I was uncomfortable doing a single **part of my job**, you're firing me . . . ." *Id.* (emphasis added). Finally, Adams' claim that "[r]arely does a section supervisor have to spend time outside of their assigned section" (Appellant Brief, p.13) is unsupported by evidence and based on her conjecture. Indeed, her job description as Team Lead belies that assertion. ROA.1202–21. As does her own admission, that other employees also worked in the Blood Bank. ROA.3308–23, ROA.2256–59, ROA.2268–75; Appellant Brief, pp. 46–49.

---

[15] ROA.1202–42; ROA.1252–54; ROA.1261–62.
[16] ROA.1164; ROA.3275; ROA.3293.
[17] ROA.1183–84.
[18] ROA.1202–42; ROA.1252–1254; ROA.1259–1260; ROA.1261–1262.

As this myriad amount of record evidence indicates, Lakeview's termination of Adams' employment for violating the Substance Abuse Policy while being on two Final Written Warnings is legitimate and non-discriminatory. *See EEOC v. LHC Grp., Inc.*, 773 F.3d at 701–02. ("Terminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate and nondiscriminatory as a matter of law.").

## 2. **Adams Failed to Demonstrate Lakeview's Legitimate, Non-Discriminatory Reason for Termination Was Pretextual.**

To establish pretext, Adams had to show either (1) that Lakeview's proffered explanation for her termination was false or unworthy of credence or (2) through evidence of disparate treatment. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *Id.* (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)).

On appeal, Adams once again relies on bald, conclusory allegations in her unsuccessful attempt to demonstrate pretext. She now denies refusing to go to the blood bank that day, but rather insists she just told Shemroske "she did not feel comfortable" going. But whether Adams characterized it as an outright refusal or a refusal by impairment, Adams was either unwilling or unable to perform an essential function of her job. *Accord Boyd v. Corr. Corp. of Am.*, 616 F. App'x 717, 720–21 (5th Cir. 2015) (finding plaintiff-employee's attempt to argue that she did not refuse

an order from her superior, but instead insisted on performing the order a different way, was nevertheless an act of noncompliance/ insubordination that differentiated her from her proffered comparators). Lakeview's employment action taken on account of that is legitimate and nondiscriminatory.

Further, Adams claims "Lakeview has changed its reason for terminating Adams" (Appellant Brief, p. 39), and the company took "two opposing positions as to whether Adams was fired because she violated the substance abuse policy" (*id.* at p. 40), based on her comparison of what it said in its EEOC position statement versus Lakeview's non-discriminatory reason for termination: violation of its Substance Abuse Policy. Adams' "evidence" does not support her position. Lakeview's statement to the EEOC clearly articulates the reason for her termination: after Adams' refusal to work in the blood bank department and upon being on two Final Written Warnings, the next step was termination. Lakeview's statement is not inconsistent with the reasons stated by Atkinson and Shemroske in her termination meeting. Her violation of Lakeview's substance abuse policy, resulting in her refusal to work in the blood bank, was the terminable event that resulted in the end of her employment at Lakeview.

Adams also plucks quotes from her unverified, surreptitiously-obtained recording of her termination meeting out of context to try to create pretext. Even

aside from the problems with the recording, the cited quotations do not support pretext:

- Virginia Adams (05:46): Okay. So just to make this clear, you're terminating me because I took a medication that I need to take for my disability?

- Janelle Shemroske (05:55): Because of the amount of-

From just these two lines, which appear to end with Shemroske being cut off before being able to finish her thought/ statement, Adams alleges: "This response by Shemroske confirms that Adams was fired because of the amount of medication she took that day." Appellant Brief, p. 41 (citing ROA.2561). This partial statement says nothing of Lakeview's reason for terminating Adams. In fact, one need only look to the next two statements made by Atkinson, clarifying Lakeview's reason for Adams' termination:

> It was the fact that . . . and you might want to read through [Lakeview's Substance Abuse Policy] because it clarifies what element of the policy was violated.
> . . .
> Yeah. I mean, I think having discussed with you, I understand the circumstances of the day. I understand that that time is when you objected to doing [blood bank work] and I think that the management's position is that that is an important function of your job and that you're obligated to do that portion along with the other portions of your job. And there's also an obligation as you'll read down further that if you're ever taking medication that might interfere with your ability to do your job, you have an obligation to disclose that.

ROA.2561–62. Plainly, Adams' misleading assertion that Adams was "fired because of the amount of medication she took that day" (Appellant Brief, p. 41) – by her own "evidence" – is patently false. ROA.2561–62.

Adams also incorrectly states attendance was a factor in her termination. Appellant Brief, pp. 43–44. She predicates her assertion on an inaccurate reading of the record, stating, "Adams' supervisor made a list of issue [sic] she had with Adams. Two of the five items were attendance." *Id.* at p. 44 (citing ROA.2423). But the document Adams cites is not a list of issues Shemroske had with Adams; it is a list of Adams' disciplinary actions, memorialized in a hand-written note by HR Vice President Chris Atkinson. ROA.2421–23.

Adams likewise continues to try to undermine the legitimacy of Lakeview's stated reasons for termination by raising a footnote in Lakeview's Position Paper to the EEOC that has nothing to do with Lakeview's reason for Adams' termination. "An employee's subjective belief that the employer's proffered reason is false will not raise a genuine issue of material fact on pretext." *Scoggins v. Chi St. Luke's Health-Brazosport*, 2021 WL 2420170, at *3 (S.D. Tex. May 12, 2021), *report and recommendation adopted sub nom. Scoggins v. Chi St. Luke's Health-Brazosport*, 2021 WL 2418002 (S.D. Tex. June 11, 2021) (citing *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997)). But despite Adams' unsupported,

conclusory allegations, she cannot refute that she was terminated a "legitimate and nondiscriminatory" reason. *See EEOC v. LHC Grp., Inc.*, 773 F.3d at 701–02.

### 3. **Adams Did Not and Could Not Identify Any Similarly-Situated Employees Because of Her Unique, Complex Disciplinary History**

Not only does Adams fail to identify a comparator employee even remotely similarly situated to her because of her complex disciplinary history, she includes next to no record citations and instead replaces them with her own conjecture as to the number and seriousness of these employees' errors.

In her brief, Adams, again without citation to the record, avers: "There are several technologist [sic] who have made errors in Blood Bank similar or more egregious than the mistake that Adams made without the mistake being written up as a HR Corrective Action disciplinary document." Appellant Brief, p. 46.

Adams then regurgitates the same failed arguments as to "Team Lead A," "Medical Technologist B," and "Medical Technologist E" she raised as supposed comparators on summary judgment.[19] But none of these Lakeview employees are appropriate comparators because none of them are similarly situated. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). In *Lee*, the Court articulated the standard for determining whether employees are similarly situated:

---

[19] Lakeview will not re-hash the dissimilarities here because this was fully discussed in its motion for summary judgment briefing (ROA.1134–32, ROA.2642–45), and Adams has raised nothing new.

[E]mployees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated. This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances." The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions.

*Lee*, 574 F.3d at 259–60 (internal citations omitted); *see also*, *Bouie v. Equistar Chems. LP*, 188 F. App'x 233, 237 (5th Cir. 2006) (per curiam) (plaintiff discharged for violating two safety protocols could not use comparator who only violated one safety protocol); *Dodge v. Hertz Corp.*, 124 F. App'x 242, 244 (5th Cir. 2005) (per curiam) (that plaintiff's and proffered comparator's acts were both "dishonest" is insufficient to make misconduct nearly identical); *Trotter v. BPB Am., Inc.*, 106 F. App'x 272, 276–77 (5th Cir. 2004) (per curiam). The Court further held that when the "difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis. *Lee*, 574 F.3d at 260, n.26. The Court also noted, "As the Supreme Court has instructed, the similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was

meted out." *Id.* at 261. None of the employees Adams cites meet these criteria to deem them similarly-situated comparators.

Accordingly, Adams has not set forth competent summary judgment evidence demonstrating any similarly-situated employees were treated differently/ better than she was, thus her attempt to establish pretext fails.

## IV.   FAILURE TO ACCOMMODATE/ ENGAGE IN THE INTERACTIVE PROCESS

Adams' attempt to revive her failure to accommodate claims and get a third bite at the apple ignores the same core issue as her previous two attempts—notice to the employer. Adams (again for the first time) argues her failure to accommodate claims should have survived dismissal based on the statutory definition of discrimination. Appellant Brief, pp. 50–53.

Not only are Adams' legal arguments on this point unpersuasive, her interpretation of guiding case law is entirely misconstrued. Despite citing only two cases in support of her assertions, Adams manages to botch them both. First, Adams cites *Equal Employment Opportunity Commission v. LHC Group Incorporated* for the proposition that "[a] failure to accommodate can be considered a second prong of a discriminatory discharge case." 773 F.3d 688, 703 (5th Cir. 2014). Appellant Brief, p. 52. But, this assertion entirely ignores that a failure to accommodate claim under the ADA is nevertheless distinct from a discriminatory discharge claim – which is exactly what the Court holds in the case Adams cites. The Court explicitly

noted in determining whether the EEOC abandoned its failure-to-accommodate claim on appeal: "In making this determination, we note that although their methods of proof are related, '[a] failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment.'" *Id.* at 703, n.6 (quoting *Windhauser v. Bd. of Supervisors for La. State Univ. & Agric. & Mech. Coll.*, 360 F. App'x 562, 565 (5th Cir. 2010)). That is, the failure to accommodate and interactive process claim must still be administratively exhausted. There is no case law demonstrating these separate claims are "automatic" when pleading disability discrimination. *See, e.g.*, *Jennings v. Towers Watson*, 11 F.4th 335 (5th Cir. 2021); *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606 (5th Cir. 2009); *Stratis Constr., Inc. v. City of Hammond*, 2020 WL 4000844 (E.D. La. July 15, 2020)

Adams next revisits *Patton v. Jacobs Engineering Group Incorporated*, to which she unsuccessfully clung in her two prior attempts to maintain failure to accommodate claims. 874 F.3d 437 (5th Cir. 2017); ROA.58–60; ROA.245–51. Though Adams wholly ignores them each time she discusses the case, there are several, significant distinctions between *Patton* and the instant matter, rendering it a poor precedent on which to hang her hat.

In *Patton*, the Court found Patton's intake questionnaire should be construed as part of the EEOC charge because the questionnaire was filed together with his formal charge of discrimination on May 7, 2014, and the charge form directs

47

complainants to "attach extra sheet(s)" "[i]f additional paper is needed." *Id.* at 443. The intake questionnaire essentially served as an *attachment* or a supplement to plaintiff's EEOC charge, such that the EEOC's investigation could reasonably be expected to grow from both the charge and the attached questionnaire. *Id.* Here, by contrast, Adams filed her intake questionnaire separately, <u>forty days prior</u> to filing her EEOC charge. Her intake questionnaire did not serve as an attachment to her EEOC charge; rather, her EEOC charge effectively amended her earlier-submitted questionnaire. Accordingly, the scope of the EEOC investigation that could reasonably be expected to grow out of the Charge came from Adams' later-filed EEOC charge, not her questionnaire. *See Pacheco v. Mineta*, <u>448 F.3d 783, 789</u> (5th Cir. 2006).

Indeed, had the scope of Adams' claims in her Charge encompassed any alleged failure to accommodate or interactive process claims included in her questionnaire, they should have been expressly described in her Charge. But they were not. Instead, Adams' Charge identified only one date on which the alleged discrimination took place and described only one alleged instance of discrimination—her termination. <u>ROA.46</u>. Those are the claims Adams signed under oath were true and correct. *Id.*

Adams' Charge is not the only indication the EEOC's investigation did not include any claims for failure to accommodate or to engage in the interactive

process. The EEOC's Notice of Charge sent on September 29, 2019, notifies Lakeview only: "This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Virginia M. Adams, under: The Americans with Disabilities Act (ADA). The circumstances of the alleged discrimination are based on Disability, and involve issues of Discharge that are alleged to have occurred on or about Aug 09, 2019." ROA.223.

Quite clearly, this Notice neither hints, nor alludes—much less plainly states—that Adams' Charge alleges any claims for failure to accommodate or to engage in the interactive process. The District Court properly dismissed these unexhausted claims—twice. ROA.85–91, 271–78.

As the District Court noted in its first Order granting dismissal of Adams' failure to accommodate and interactive process claims, "Even construed liberally, nothing in [Adams' EEOC Charge Particulars] description references a failure to accommodate or failure to engage in the interactive process." ROA.89. Likewise, the earliest and latest date(s) on which Adams alleges the discrimination took place is the same: August 9, 2019—the date of Adams' termination. ROA.46. In her Charge Particulars, Adams notes the date she was sent home from work for taking too much Benadryl—July 26, 2019—but does not even remotely allege that her being sent home (instead of, for example, being allowed to work in a different section of the lab) was a failure to accommodate her disability, nor did Adams list

July 26, 2019, as a date on which any alleged discrimination took place. *Id.* Instead, the only alleged discrimination the narrative contemplates is Adams' discharge. *Id.*

Even assuming *arguendo* that checking the box for disability on an EEOC charge of discrimination effectively serves as checking a box for failure to accommodate (which it does not), merely checking a box is not enough to put an employer on notice. *See Spindle v. CKJ Trucking, LP*, No. 4:18-CV-818, 2020 WL 1283519, at *2 (E.D. Tex. Mar. 18, 2020).

Further, textual comparison of the FMLA with the ADA demonstrates why requesting FMLA leave alone is not a request for an ADA reasonable accommodation. An employee who requests FMLA leave asserts he has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D) ("Entitlement to leave"). A request for a reasonable accommodation under the ADA is a claim that the employee "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) ("Definitions: Qualified Individual"). *See Capps v. Mondelēz Global LLC*, 147 F. Supp. 3d 327, 340–41 (E.D. Penn. 2015) ("an employee who requests leave does not clearly communicate to her employer that she is disabled and desires an accommodation.") (quoting *Rutt v. City of Reading*, No. 13–4559, 2014 WL

5390428, at *4 (E.D. Pa. Oct. 22, 2014)). Thus, Adams' multiple requests for leave do not equate to requesting a reasonable accommodation under the ADA.

Accordingly, despite her three separate attempts to bring back her failure to accommodate and interactive process claims, Adams has failed to move the needle. And as the adage goes: "Three strikes and you're out."

## V.    **The District Court Properly Denied Adams' Motion to File a Sur-Reply.**

Incredibly, Adams claims the District Court abused its discretion in denying her motion to file a sur-reply to Lakeview's motion for summary judgment because Lakeview first addressed Adams' failure to plead FMLA retaliation in its reply brief. Appellant Brief, pp. 53–54. It is obvious Lakeview addressed this issue only in reply because *Adams raised it for the first time in her opposition brief.* ROA.2245–47. Adams should not benefit from this inappropriate practice. This Court has repeatedly held that "district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment." *See Jackson*, 2021 WL 5113162, at *5. Accordingly, the District Court did not abuse its discretion in denying Adams' motion to file a sur-reply.

Adams also appears to argue her motion to file a sur-reply should have been granted because she belatedly subpoenaed her own TAFW records, and her counsel was out of the country when they were eventually received from Sedgwick, the leave

of absence claims administrator. Appellant Brief, pp. 54–55. Yet, this meandering colloquy never comes to a head—it says nothing of how Adams and her counsel's self-imposed delay in obtaining the TAFW records affected her ability to incorporate them in her summary judgment briefing – nor does it explain counsel's dilatory behavior in obtaining and reviewing the records.

As she did throughout this litigation, Adams attempts again—this time on appeal—to foist her own obligation to timely obtain records, documents, or any other things she intends to cite as evidence to substantiate her claims, onto the Court and Lakeview. Appellant Brief, pp. 54–55. Lakeview produced TAFW documents it had in its possession, and, in fact, left no stone unturned—running multiple electronic record searches for additional responsive documents after its initial production, in keeping with the Magistrate's directive to do so. ROA.1343–1484. That Lakeview may not have produced a full and complete record of Adams' LOA records is by no means "curious," as Adams disingenuously implies. Appellant Brief, p. 54. Because, as Lakeview has clarified time and again, it is <u>not</u> the custodian of Adams' LOA records—TAFW, the third-party leave administrator is, which is why it was Adams' obligation to issue a subpoena for a complete and authentic copy of her leave records had she wanted them. ROA.1340; ROA.1113; ROA.1147; ROA.1273–74; ROA.3402–03.

## **CONCLUSION**

Lakeview respectfully requests this Honorable Court affirm the District Court's rulings dismissing Adams' case against Lakeview, with prejudice and at her cost.

Respectfully submitted:

*/s/ Leslie W. Ehret*_____
Leslie W. Ehret (La. Bar No. 18494)
Anna K. Potter (La. Bar No. 38376)
**FRILOT L.L.C.**
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8023
Facsimile: (504) 599-8263
lehret@frilot.com
apotter@frilot.com
*Counsel for Defendant/Appellee,*
*Columbia/HCA of New Orleans, Inc. d/b/a*
*Lakeview Regional Medical Center,*
*A Campus of Tulane Medical Center*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing brief was filed electronically with the Clerk of Court using the CM/ECF system on the 31st day of October, 2022. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system, and undersigned counsel certifies a copy of this Appellee's Brief has been served by email and by mail to all counsel of record.

Respectfully submitted:

*/s/ Leslie W. Ehret*_____
Leslie W. Ehret (La. Bar No. 18494)
Anna K. Potter (La. Bar No. 38376)
**FRILOT L.L.C.**
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8023
Facsimile: (504) 599-8263
lehret@frilot.com
apotter@frilot.com
*Counsel for Defendant/Appellee,*
*Columbia/HCA of New Orleans, Inc. d/b/a*
*Lakeview Regional Medical Center,*
*A Campus of Tulane Medical Center*

<u>**CERTIFICATE OF COMPLIANCE**</u>

1. This brief complies with the length requirement of <u>Fed. R. App. P. 32(a)(7)</u> because it contains <u>12,407</u> words, in keeping with <u>Fed. R. App. P. 32(a)(7)(B)</u> and <u>Fed. R. App. P. 32(f)</u> requirement limiting a principal brief to no more than 13,000 words.

2. This brief complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because it has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman type style, 14 point font and 12 point font for the footnotes.

Respectfully submitted:

*/s/ Leslie W. Ehret*
Leslie W. Ehret (La. Bar No. 18494)
Anna K. Potter (La. Bar No. 38376)
**FRILOT L.L.C.**
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8023
Facsimile: (504) 599-8263
lehret@frilot.com
apotter@frilot.com
*Counsel for Defendant/Appellee,*
*Columbia/HCA of New Orleans, Inc. d/b/a*
*Lakeview Regional Medical Center,*
*A Campus of Tulane Medical Center*